**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**LYNA JIMENEZ-RUIZ,**

       **Plaintiff,**

**v.**                        **CASE NO.  8:18-CV-01768-T-02-AEP**

**SCHOOL BOARD OF**
**SARASOTA COUNTY,**

       **Defendant.**

_____/

**PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT**
**OF PLAINTIFF'S RESPONSE TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

      Plaintiff, Lyna Jimenez-Ruiz ("Plaintiff" or "Ruiz"), by and through her undersigned

counsel hereby submits its Statement of Disputed Facts in Support of Plaintiff's Response to

Defendant's ("Defendant" or "SBSC") Motion for Summary Judgment:

**PLAINTIFF'S DENIALS AND ADMISSIONS TO**
**DEFENDANT'S STATEMENT OF UNDISPUTED FACTS**

1.     Admitted.
2.     Denied (Ruiz Dec. ¶4 ).[1]
3.     Admitted.
4.     Admitted.
5.     Admitted.
6.     Admitted.
7.     Denied. (Ruiz, Ex.8,p.6; Bowden, 108:17-20; 110-111:25-7; 129:20-21; Rose. 5-7:16-6).[2]
8.     Denied. (Ruiz, Ex.1,p.19; Ruiz. Dec.¶11; Shelley, 35:4-13).
9.     Denied. (Ruiz Dec.¶20).
10.    Denied. (Ruiz Dec. ¶21; Ruiz, 47:4-11).
11.    Admitted.
12.    Denied.(Ruiz Dec.¶13; Ruiz 118-119:4-1; Pritz Dec ¶6,10; Clarkson, 25:19-25; 57:9-25; Larkin, 32:3-5).
13.    Admitted.
14.    Admitted.
15.    Admitted.
16.    Admitted.
17.    Admitted.
18.    Admitted.

---

[1] Witness Declarations will referenced as "Witness Dec. ¶".
[2] Depositions will be referenced as "Deponent, page:line".

19.     Admitted.
20.     Admitted.
21.     Admitted.
22.     Denied. (Ruiz, Dec.¶13; Ruiz 118-119:4-1; Pritz Dec ¶6,10; Clarkson, 25:19-25; 57:9-25; Larkin, 32:3-5).
23.     Denied. (Ruiz, Dec.¶13; Ruiz 118-119:4-1; Pritz Dec ¶6,10; Clarkson, 25:19-25; 57:9-25; Larkin, 32:3-5).
24.     Denied. (Ruiz Dec.¶22; Shelley, 91-92:23-20; 95-96:3-3; 103:13-16; 107:18-21; 108:17-24; 109-112:1-9; Ex.6,7)
25.     Denied (Ruiz Dec.¶23; Shelley, 118-119:13-15; Ex. 9).
26.     Denied.(Shelley, 117:12-25; 118-119:13-15; 122-123:18-5;Ex. 9).
27.     Admitted.
28.     Admitted.
29.     Admitted.
30.     Denied. (Ruiz, 97-98:15-10; Ruiz Dec.¶24; Larkin:48:8-11; Clarkson:32:19-22).
31.     Admitted.
32.     Denied. (Ruiz Dec.¶26).
33.     Denied. (Shelley II, 31-32:9-6; Ruiz Dec.¶27).
34.     Denied. (Ruiz Dec.¶28).
35.     Admitted.
36.     Admitted.
37.     Denied.  (Shelley, Ex.24; Ruiz Dec¶13,29).
38.     Admitted.
39.     Admitted.
40.     Admitted.
41.     Admitted.
42.     Admitted.
43.     Admitted.
44.     Denied. (Ruiz Dec.¶30).
45.     Denied. (Ruiz Dec.¶30).
46.     Admitted.
47.     Denied. (Ruiz, 88:12-22; Harayda, 38:22-24).
48.     Denied. (Harayda, 20:11-20).
49.     Denied. (Shelly II, 60:8-11).
50.     Denied. (Ruiz, 112:10-21).
51.     Denied. (Ruiz, 112:10-21; Ruiz Dec.¶31).
52.     Denied. (Ruiz Dec.¶32).
53.     Denied. (Ruiz, 92-93:2-6; Ruiz Dec.¶33; Pritz Dec.¶8; Clarkson, 36:5-8).
54.     Denied. (Ruiz, 90:14-24; Larkin, 55:18-21; Shelley, 89:22-24; 90-91:4-22).
55.     Denied. (Ruiz Dec.¶33).
56.     Denied. (Ruiz Dec.¶34; Lempe, 34-35:24-2; 45:9-19).
57.     Denied. (Ruiz, 94:19-22; 119-120:12-2; 148-149:15-20; Shelley,13:7-13; 15:13-16; Ex.5; Harayda, 24:1-10; Shelley II, 267:19-24; 268:16-23; 269:9-20; 282:21-24; 295-296:25-17;343-344:4-1; 346:13-23; 348:14-20; Exs.18,28,29,32; Ruiz Dec.¶36).
58.     Admitted.
59.     Denied. (Shelley II, 91-92:20-17; Exs.28,30; Ruiz Dec.¶35).

2

60. Denied. (Cantees, 69:1-7; Rose, 58-59:21-3; 59-60:20-23;63:1-21; 64-65:14-4; Ruiz Dec.¶37).
61. Denied.(Bowden, 34:9-23;Shelley II, 13-17).
62. Denied. (Ruiz Dec.¶38; *see supra* responses: 32,32,34,37,47,48,50, 51,52,53,54,55,56,57,59,60,61).
63. Denied. (Ruiz Dec.¶38; *see supra* responses: 22,23,24,25,26,30,32,33,34,37,44,45,47,48,50,51,52,53,54,55,56,57,59,60,61).
64. Denied. (Ruiz Dec.¶38; *see supra* responses: 37,50,51,52,53,54,55,56,57,59,60,61).
65. Denied. (Ruiz Dec.¶17,38; Pritz Dec.¶3,4,5,7,10;*see infra* responses: 67,69,70,71,72,73,74,75).
66. Denied. (Ruiz Dec.¶39; Shelley, Ex.5; Shelley II, 31:3-19; Exs. 18,28; *see supra* responses 62,63,64,65).
67. Admitted.
68. Admitted.
69. Admitted.
70. Admitted.
71. Denied. (Ruiz, 63:19-25; Ruiz Dec.¶17; Pritz Dec.¶ 3,4,5,7,10).
72. Admitted.
73. Admitted.
74. Admitted.
75. Admitted.
76. Admitted.
77. Denied. (Ruiz, 63:19-25; Ruiz Dec.¶17; Pritz Dec.¶ 3,4,5,7,10).
78. Admitted.
79. Admitted.
80. Admitted.
81. Admitted.
82. Admitted.
83. Denied. (Ruiz, !53-157:20-12, Ruiz Dec.¶40).
84. Admitted.
85. Admitted.

## PLAINTIFF'S STATEMENT OF DISPUTED FACTS

1. Lyna Jimenez-Ruiz (Ruiz") was sexually harassed and retaliated against by Todd Bowden ("Bowden") and Rachel Shelley. (Doc.16; Ruiz, Ex.1, p.3-4; Shelley II, Ex.31, p.2).

2. Bowden also sexually harassed Amy Kerns ("Kerns") and Sue Forrest ("Forrest"), former employees at Suncoast Technical College ("STC"). (Ruiz, 26:24-25; 27:1-15; Ex.1, pp.3,5, 21-22; Ruiz Dec.¶41,42).

3.      Ruiz was offended by Bowden's continuous inappropriate comments and accusations, but she was afraid to admit it for fear of not fitting in or being accepted. (Ruiz, 18:22-25; 19:1-10; 20:18-25; 21:1-2; 130:15-19; Ex. 1, p. 8,9,10,12,13,24; DiPillo, 31:4-19;43:5-13; Ruiz Dec.¶4).

4.      In July 2015, at the FACTE conference, to which Bowden often referred as "wild", Bowden harassed Ruiz by asking her to have shots with a vendor to butter him up; sitting uncomfortably close to her at dinner; asking her how long she had been alone and how long had it been since she had sex, how could she go so long and if she was lonely; discussed his wife's accusation of cheating on him, that it was ok to cheat and admitting that he had come close but stopped before sex; telling Ruiz she needed learn how to have fun; pressuring her to have Fireball shots with him and making reference to the lewd *Fireball* song by Pitbull. All of this behavior made Ruiz uncomfortable.  (Ruiz, Ex.1, p. 11; Ruiz Dec. ¶5).

5.       Later that night at the FACTE conference, Bowden insisted on walking Ruiz to her hotel villa.  Ruiz refused; Bowden insisted. Upon arrival, Bowden asked to be invited in; Ruiz said no. Bowden asked why; Ruiz replied "Because I am not a homewrecker." This was very upsetting to Ruiz.  (Ruiz, 16:10-18; Ex.1, p. 12; Ruiz Dec.¶6).

6.      Following Dr. Bowden's indecent proposal, Ruiz immediately called her sister and brother-in-law, Ileana and Richard Capilla, and told them Bowden made a pass at her and expressed her fear that this was going to change her life. (Ruiz, Ex. 1, p.12; Ruiz Dec.¶5; I.Capilla Dec.¶4).

7.      Ruiz confided in Ron DiPillo ("DiPillo") that Bowden was harassing her.  DiPillo acted as if he knew what happened and suggested she contact Al Harayda ("Harayda") if she felt she was being harassed.  In a later conversation with Trent Terry ("Terry"), he acted as though he knew something had happened and also stated she should contact Harayda.  Ruiz also told Tripp

Jennings ("Jennings"). DiPillo, Terry and Jennings were SBSC administrators. None of them reported the incident to Bowden until months later although it was policy to do so.  (Ruiz, Ex.1, p.14; DiPillo, 32-33:2-12; 44-45:15-10).

8.      Thereafter, Bowden set Ruiz up to fail giving her much more responsibility than the other administrators so he could accuse her of not following directives and reprimand her and made drastic changes to Ruiz' job responsibilities taking away her authority to approve purchase orders, payroll and sign checks.  (Ruiz, 39:9-15; 40:15-25; 41:1-24; 126:10-16; Ex. 1, p.13,15).

9.      On February 22, 2016, after being advised of Ruiz' allegations, Bowden, instead of following HR policy and reporting to his supervisor, Lori White ("White"), chose to directly confront Ruiz by handing her an Equity Complaint and telling her to file it with Harayda and "see how far you can get with this". (Ruiz, 42:2-18; Ex.1, p. 16; Harayda, 25-26:24-14; Shelley, 12:4-11; 17-18:25-8; 46:10-12).

10.     Bowden claims Ruiz told him he had never behaved badly.  Ruiz never said that. (Bowden 80:11-12; Ruiz, 21:3-14).

11.     On the same day that Bowden confronted Ruiz, at the Preparing New Principals ("PNP") meeting, HR Director, Roy Sprinkle ("Sprinkle"), deviated from the scheduled agenda and presented on the Equity Complaint process.  He advised that if an employee files against a supervisor they should just leave the District.  (Ruiz, p. 39:16-23; 42-44:23-2;  Ex.1, p.16; Dorn Dec. ¶3).

12.     Ruiz received a "Highly Effective" evaluation at STC her first year under Bowden.  After Bowden was made aware of Ruiz' allegations, Bowden provided Ruiz with a "Needs Improvement" evaluation. (Ruiz, 185:16-20;Ruiz Dec.¶8).

13.    Ruiz was removed from the PNP program due to the evaluation she received from Bowden for the 15-16 school year, Bowden's refusal to sign off, and Shelley's refusal to sign off.  Nikhil Joshi ("Joshi"), in his investigative report ("Joshi Report"), recommended SBSC conduct an independent review of Ruiz' PNP profile.  This was not done.  (Ruiz 50-51:22-11; 54:14-18; Ex.1; Shelley, 49:10-24).

14.    Ruiz did not file an Equity Complaint immediately because she thought it would be career suicide.  Her mentor, former Pineview Principal, Steven Largo ("Largo") stated he "100% believed Ruiz' [story] as he always found her to be honest and trustworthy", and advised Ruiz not file a complaint as it would not be helpful to her future.  (Ruiz, 31:18-21; Ex. 1, p.17-18; DiPillo, 32-33:25-5; I.Capilla Dec. ¶4.).

15.    In 2016, when she realized she was not staying at STC, Ruiz sent messages to Bowden that she appreciated him and thanking him to feed his ego so that he would help her get well placed at another school such as Pineview where there was a vacancy.  Largo advised her to reassure Bowden she had his back and let him feel as though he had the power.  Ruiz' brother-in-law, Richard Capilla gave the same advice and Ruiz chose to it. (Ruiz, 128:13-20;220:6-19; Ex. 1, p.17-18; Ruiz Dec. ¶9).

16.    In April 2016, Bowden approached Ruiz about transferring from STC advising changes were needed.  However, Bowden claims Ruiz asked to transfer to Pineview and denied initiating the transfer, but later admitted he wanted her transferred.  (Ruiz, Ex. 8, p. 6; Bowden, 108:17-20; 110-111:25-7;129:20-21).

17.    Bowden advised Stephen Covert ("Covert"), Principal of Pineview, and  Steven Cantees ("Cantees"), Executive Director of High Schools, that Ruiz was difficult to work with.  This

blocked Ruiz from transfer to Pineview. (Ruiz, 45-46: 9-17; 217-218:14-1; Dorn Dec.¶5; Ruiz, Ex.1, p. 32).

18.     There was not an administrative vacancy nor funding in the Booker High School ("BHS") budget for another administrator.  However, Ruiz was transferred to BHS into a lower position as Testing Coordinator with an Assistant Principal ("AP") title and was expected to perform both full-time positions. BHS is a difficult, challenging school with a low rating. Transfer to BHS is viewed as a "punishment". The principal of BHS, Rachel Shelley ("Shelley), has a reputation for being difficult. As Ruiz was packing her office to transfer, Bowden commented "We will see how you do with that bitch." (Ruiz, 47:2-22; 166-167:23-15;169:5-23;170:17-18; Ex. 1, p.19; Ruiz Dec.¶10, 11,12; Cantees, 41:6-17; 42:12-13;Shelley, 27:19-21; 29-30:24-1;Larkin, 9:1-6; Clarkson, 40:1-15).

19.     In an April or May 2016 meeting between Cantees , Karen Rose ("Rose"), former Executive Director of Middle Schools and a 29-year employee of SBSC with a Bachelor's degree in Psychology and Masters in Education, Laura Kingsley ("Kingsley"), Assistant Superintendent, White and Bowden, Cantees asked Rose to take Ruiz into the middle school system and advised Bowden.  Bowden insisted "No, you are taking her" thus indicating Bowden wanted Ruiz in a high school.  Cantees denied recalling that conversation. Instead, Cantees claims the decision to transfer Ruiz from STC to BHS was his decision along with Lori White. (Rose, 5-7:16-6; Cantees, 23:14-18;26:2-4;28-31:8-6;32:22-25).

20.     Cantees and Bowden informed Ruiz together that she was being transferred to BHS although there was no requirement Bowden be present.(Cantees, 39:2-14).

21.     Cantees stated that Ruiz had skill sets from her position at Pineview that would work at BHS.  However, Shelley disagreed and was shocked and surprised by what she claims was a skill deficit. (Cantees, 41:6-7; Shelley, 24:15-19; 104:15-20).

22.     Shelley did not need a third AP.  She needed a Testing Coordinator.  Shelley stated she could see how a transfer from Assistant Director at STC to Testing Coordinator at BHS could have been perceived as a demotion.  (Shelley, 35-36:8-6).

23.     Cantees claims he advocated for Ruiz to maintain her 12-month contract rather than convert to 11 months as an AP.  However, Shelley claims she advocated for this, Cantees disagreed, so she went over his head to White. (Cantees, 44-45:22-3; Shelley, 63:-64:19-2; 69:10-17).

24.     In August 2016, Ruiz came forward with Forrest to Shelley alleging Bowden sexually harassed them.  Shelley reported the allegations to HR. (Ruiz, 161, 7-10; Shelley,40:15-19).

25.     Shelley believed Forrest and considers her a woman of integrity and honesty.  DiPillo also considers Forrest credible. Bowden stated Forrest lied and she was coached by Ruiz, although he did not report this to Joshi during his interview in the investigation (see ¶44 below) nor does he have a witness to support his theory. (Shelley, 41:9-22; 47:5-9; DiPillo, 59:10-11; Bowden, 67:6-18; 69-70:24-4).

26.     Scott Lempe, former Deputy Superintendent and COO, stated he believes Ruiz' story. (Lempe, 37:10-14).

27.     In or around August 2016, Scott Lempe was asked to oversee the superintendent hiring process.  Lempe heard Bowden was accused of sexual harassment and he along with Lori White and Art Hardy decided to investigate, SBSC retained Nikhil Joshi, an investigation ensued resulting in the Joshi report. (Lempe, 7:14-16; 10:2-20; Ruiz, Ex.1).

28.     The October 6, 2016 Joshi report is based upon a flawed investigation.  (Ruiz Dec.¶43; Ruiz, 11:18-25; 30:21-25; Ex. 1; R.Capilla Dec.¶4; Harayda, 18-19:19-3).

29.     Bowden was voted in as Superintendent in October 2016 and took office in March 2017. (Shelley, 127:15-17).

30.     When Bowden became superintendent, the administration became a hostile, toxic, boys' club environment.  Bowden is manipulative and a master self-preservationist.  He demands absolute loyalty on the pain of being dispensed. Kingsley, Bowden's assistant superintendent, made it clear who was on the "hit list".  Cantees changed after Bowden took office focusing on Kingsley's "hit list" .  Cantees and Sonia Figueroa-Alberts, Executive Director of Pupil Support Services, "drank the Kool-Aid" and became part of the Bowden/Kingsley boys' club.  Ruiz was on the "hit list" after she came forward and Bowden was in the hiring process in 2016 for superintendent and her career began to dismantle at that time. (Lempe, 19-20:22-9; 37:16-23; 41:1-3;41:9-19; Rose, 65:18-20; 26:16-24;10:21-22; 11:12-13; 57-58:16-1; 58-59:9-3; 18:1-5; 63:16-24).

31.     Bowden engaged in "boys' club activities such as going to strip clubs while at educational conferences/functions, drinking a fair amount on more than one occasion, making loud drunken outbursts in public at work-related functions, and propositioning a young waitress who was formerly a Playboy model for her autograph while out with colleagues. (Bowden, 119-120:4-14; 136:13-15; Lempe, 16:21-22;18-19:3-4).

32.     Cantees and Bowden are friends.  They attended football games and went out to dinner together. (Cantees, 27:7-15).

33.     Cantees supervised Bowden for approximately two years when he first came to the District.  Thereafter, the District hired Melissa Morrow who reported to Cantees and Bowden

then reported to Morrow until her position was eliminated.  Cantees denied changing Bowden's

2011-2012 evaluation rating of "Effective" that was issued by Morrow to "Highly Effective".

However, when he was presented a copy of the revised evaluation, he agreed that he had done so.

(Cantees, 17:12-19; 18-19:12-13; 26-27:5-2; 76-77:15-21).

34.    The "Boys' Club" soldiers even affected how African-American principals were treated -

respected to their face and disrespected behind their backs.  This is because their surveys came

back low.  Cantees commented how he had to tolerate Shelley-that she was his challenge. When

Shelley was made Principal of the Year, there was no process to her selection.  Kingsley just

decided to offset her low surveys.  (Rose, 50-51:17-25; 53:1-11;53-54:21-13).

35.    Lempe was also in the "hit list".  Following the investigation and Bowden taking office,

Board Chair, Caroline Zucker, advised Lempe that Bowden decided not to roll his contract for

the following year.  Bowden validated Zucker's comment and told Lempe he was unhappy

Lempe did not advocate for him more to become superintendent.  Lempe's contract was

renewed, but he knew Bowden had an agenda to get rid of him and Lempe's moral compass did

not align with Bowden's so he resigned despite the fact doing so caused damage to his pension.

(Lempe, 11-12:19-8; 14:4-12).

36.    Shelley followed the lead of the Bowden/Kingsley administration knowing Ruiz was on

the "hit list".  Ruiz enjoyed her job at BHS and her relationship with Shelley was positive until

Bowden was approved as the next superintendent in October 2016 at which time Shelley began

picking on Ruiz in September or October 2016.  Shelley's ultimate goal was to non-renew Ruiz'

administrative contract. (Ruiz 118-119:4-1; Ruiz Dec. ¶13; Pritz Dec ¶10; Clarkson, 25:19-25;

57:9-25;Larkin, 32:3-5).

37.     Shelley provided Ruiz with an "Effective" evaluation for the 16-17 school year using an administrator tool to evaluate both her role as an administrator and her role as testing coordinator.  Had Shelley used the non-classroom instructional tool to evaluate her role as a testing coordinator, her evaluation may have been higher. (Shelley, 54-55:24-7; 59:15-20).

38.     Late in 2016, Ruiz began speaking with Shelley about the 17-18 contract renewal. Shelley asked Ruiz if she was looking elsewhere and suggested she should consider the position at Suncoast Polytechnical High School ("SPHS") as she would be a good fit.  Ruiz noted a change in Shelley after that discussion.  (Ruiz, 147-148:1-14; Ex. 8, p. 6; Ruiz Dec.¶14).

39.     Shelley was hard on and disrespectful to Ruiz and got tougher on her throughout Ruiz' two years at BHS so much so that Larkin also discussed with Ruiz that she should consider looking for jobs in other counties.  While Shelley was hard on a lot of people, she treated Ruiz differently, picked on her and tried to make her look bad. (Ruiz, 139-140:10-9; Larkin, 29:1-4; 32:3-11; Clarkson, 22:9-16).

40.     Shelley belittled Ruiz in staff meetings  (Ruiz, 137-138:22-25).

41.     Shelley put Ruiz in charge of Teacher/Staff Appreciation week but did not budget any money to purchase what was needed in hopes that Ruiz would fail.  However, Ruiz obtained donations, purchased and cooked everything herself for 200 people and it was well received and appreciated by the staff. (Ruiz, 140-141:107).  Shelley did not even attend.  (Clarkson, 23:11-22).

42.     Shelley again did not budget money for Ruiz to plan the annual Volunteers Breakfast, so Ruiz' assistant and a prior student cooked using their time and money along with Ruiz.  (Ruiz, 141-142:8-1).

43.     Shelley identified Darby Larkin ("Larkin"), an AP with Ruiz at BHS, as someone who could "assess" Ruiz.  Larkin found Ruiz to be a lovely person and wonderful to work with, an administrator who cares deeply about her students, hard-working, thorough, detail-oriented, wants to help any way she can, professional and a good leader.  Larkin found Ruiz to be organized and success-oriented as to students and faculty.  Larkin found Ruiz to be an effective decision-maker and problem-solver, and good with technology.(Larkin, 17:8-9; 19:5-21;23:2-24; 25:2-13;Ex.1).

44.     Shelley criticized Ruiz' testing procedures without reason and placed unrealistic expectations on her.  However, Ruiz had a 98% student testing rate when the average was 95%, and the teachers and staff appreciated Ruiz' testing procedures and thought they were superior to previous coordinators.  Larkin thought testing always came off without a hitch; she did not understand Shelley's contention.  (Ruiz, 142-144:2-1; Shelley, 75:8-10; 77-78:23-4; Larkin, 39:15-25; Pritz Dec.¶7).

45.     Shelley was not happy with Ruiz' performance as an AP.  However, the other administers and staff thought she did a great job. Shelley claims Ruiz did not meet her teacher evaluation schedule.  Ruiz and other administrators claim she did.  (Shelley, 78:16-19; 79-80:22-4; Larkin, 16:15-17; 39:15-22)

46.     Shelley criticized how Ruiz handled discipline issues without reason.  Larkin found that Ruiz handled discipline well and was effective.  (Ruiz, 144-145:2-10; Larkin, 22:15-24).

47.     Despite the way Shelley treated Ruiz, Ruiz' staff validated that she continued to perform well due to her work ethic and ability to focus on what is right.  Ruiz made a difference in her staff members' lives.  Ruiz further measured her performance based upon the students and teachers she helped. The BHS students, staff and all administrators, except Shelley, loved Ruiz.

The teachers were very upset about how Shelley treated Ruiz. (Ruiz, 150-151:7-18; Larkin:21:2-13; Clarkson, 27:6-16).

48.     Two months after Bowden took office, Shelley issued a memorandum of instruction to Ruiz on May 8, 2017 identifying two areas of concern.  Shelley claims it was a matter of "common practice", although not written policy or procedure, to copy the memo to Cantees and the District's counsel, Art Hardy.  Ruiz' response to the memo was not satisfactory to Shelley. While the memo alleged concern over "Specific performance areas based on previous evaluations", Shelley admits there had been no previous evaluations performed upon which to evaluate Ruiz' performance. Part of Shelley's concerns related to commitment to the school and teachers and concerns related to testing.  However, multiple teachers have expressed appreciation for Ruiz' commitment to them and for her handling of testing.  (Shelley, 91-92:23-20; 95-96:3-3; 103:13-16; 107:18-21; 108:17-24; 109-112:1-9; Ex.7).

49.     In May 2017, Ruiz' son was accepted to University of Florida and Shelley criticized Ruiz, a single mother, for requesting time off to attend her son's college orientation. (Shelley, 137:5-8; 138:3-13).

50.     In her June 29, 2017 evaluation of Ruiz for 16-17, Shelley rated Ruiz "Effective" in the two areas of concern identified one month prior in her memo of instruction and rated her overall "Effective".  Ruiz reiterated via email what they had discussed the day prior and that she should have actually been rated "Highly Effective".   Shelley claimed not to recall Ruiz' response, but in fact, while Shelley denies it, she was up against a deadline and instructed Ruiz to sign off on the evaluation as it stood.  (Shelley, 117:5-25; 118-119:13-15; 120-121:20-8; 121-122:20-7; 122-123:18-5; Ex. 9; Ruiz Dec.¶15).

51.     Shelley had to justify what she needed to do, was expected to do and what she promised to do, so she nitpicked everything about Ruiz including the fact she was Hispanic. (Ruiz, 173:9-14).

52.     During the Fall of 2017, Shelley assigned Ruiz to cover an outdoor track meet while the remaining four administrators, including Shelley, were inside covering a basketball game, and assigned her to drive three hours to cover the Lemon Bay Highschool football game when no administrators were previously required to attend.  (Ruiz, 117:1-22; 134:1-19; Larkin,45-46:9-5).

53.     Shelley criticized Ruiz for not being in attendance at 2017 Homecoming festivities. However, Ruiz left early on October 27, 2017 from the pep rally feeling ill; she was diagnosed by Dr. Emily Sheets on October 28, 2017 with  PTSD, Major Depressive Disorder and Generalized Anxiety Disorder as a result of the sexual harassment, retaliation and all the work-related stress she was enduring .  Pursuant to doctor's orders, Ruiz took medical leave necessitating her absence from the remaining homecoming festivities.  (Shelley, 88:1-4; Shelley II, 207:3-9; 210-211:24-7; Ruiz, 212-214:24-9; Sheets Dec.¶1-5).

54.     Despite the fact that Ruiz was communicating with Shelley about her time out of work and her anticipated return to work date, Shelley began dismantling Ruiz' duties on October 31, 2017 after she was out of work one day and continued to do so and advised employees that Ruiz was not returning.  Shelley advised Judy Clarkson, Ruiz' administrative assistant who had been employed with SBSC for approximately 15 years, not to speak with Ruiz as they "have moved in another direction".  (Ruiz, 87:7-23; 96-97:22-19; 98:11-23; 100:16-25; 104:15-19; Shelley II, 190-191:18-12; 192:1-7; 197:11-18; 198:3-19; 201-202:11-9; 203-204:24-12;Clarkson, 33:8-13).

55.     On November 13, 2017, Ruiz called and advised Shelley and Harayda she would be taking additional time off per her physician's order and she put in her request for FMLA.  That

same day, Shelley claims she sent a letter to Ruiz certified mail, although not so marked,

expressing concerns regarding Ruiz' performance.  These concerns were different than those

expressed in the May 7, 2017 Memo of Instruction and the letter was not the form used by the

District for counseling or reprimand. Ruiz received the letter via U.S. Mail on November 28,

2017 while she was out on FMLA leave.  Shelley did not request a meeting with Ruiz to discuss

the concerns addressed in the November 13, 2017 letter. (Ruiz, 84:7-11; Ruiz 84-85:18-7;

100:15-25; Shelley II, 210-211:24-7; 211-214:8-8; 216-217:3-6;Ruiz Dec.¶26,27,28).

56.     After learning Ruiz was taking FMLA leave, Shelley admits to reassigning Ruiz' job

duties and sending an email to staff and teachers on November 14, 2017 with reassignments

effective immediately, even though she knew Ruiz intended to return on November 27, 2017.

(Shelley II, 229-230:20-23; 233:7-14).

57.     Shelley took Ruiz off the District email list while she was out on leave.  This was not

common practice. Shelley claims Harayda advised her she could do this, but Harayda denies

knowing Ruiz was removed from the District email list. (Ruiz, 88:12-22; Shelley II, 240-241:5-

12; Harayda, 38:22-24; ).

58.     Shelley claims Ruiz' medical leave created a hardship, however, she admitted to having

the equivalent of 6 AP's at the time Ruiz took leave that handled the functions previously

handled by 3 administrators.  (Shelley, 89:22-24; 90-91:4-22).

59.     Ruiz lost personal time and sick days and had to borrow hours from her sister as a result

of her FMLA leave. (Ruiz, 114:1-14).

60.     Ruiz filed an Equity Complaint on November 17, 2017 and an addendum on November

28, 2017 claiming retaliation by Shelley.  Shelley claims she did not receive notice of these

complaints until 4, 5 or maybe 12 months after they were filed.  However, Shelley had notice

much sooner; SBSC retained Richard Blystone on December 18, 2017 to conduct an investigation into the equity complaints which was concluded February 14, 2018.  Shelley was interviewed as part of this investigation most likely at the end of 2017. (Shelley II, 243:5-20; 305:1-15; 308-310:17-3; 311-312:25-2;Ex. 31; ).

61.      Following the Equity Complaints Ruiz filed against her, Shelley made a predetermined decision of non-renewal of  Ruiz.  In late November or early December 2017, Rose overheard Cantees speaking with Kingsley that Shelley planned to non-renew Lyna. At cabinet meetings that followed the Cantees/Kingsley conversation, Bowden repeatedly emphasized that warning letters need to go out if you are considering nonrenewal. (Rose, 58-59:21-3; 59-60:20-23;63:1-21; 64-65:14-4).

62.      The Blystone report is based upon a flawed investigation.  (Ruiz, 78-80:10-1;145:11-13; Ex. 8; Ruiz Dec.¶16; Shelley II, Ex. 31; Larkin, 27-28:21-15).

63.      Kathy Pritz, former ESOL liaison, informed Ruiz that Shelley may have treated Ruiz differently due to her race and/or national origin and Ruiz believes this to be true. Shelley made racially discriminatory remarks to Ruiz.  (Ruiz 62-63:23-3; 66-67:12-11; 69:1-18; Pritz Dec.¶3,4,5,10; Ruiz Dec.¶17; Clarkson, 37:18-24).

64.      When Ruiz returned to work following her leave, she was placed at BHS under Shelley's supervision despite the fact she filed a claim for retaliation against Shelley and the District could have placed her elsewhere such as at Riverview High School as she requested.  (Ruiz, 93:11-21; 111-113:17-20; 116:15-20; 128:21-25; Ruiz Dec.¶18).

65.      When Ruiz returned to part-time work following her FMLA leave on January 29, 2018, Shelley was not welcoming and unsupportive.   Shelley asked Ruiz to write a student behavior report regarding an incident in which Ruiz was not involved. This was not normal procedure.

Shelley also responded to an email from Ruiz "Shouldn't you be in therapy?". (Ruiz:90:14-16; 90-91:24-7;106:25-16; 11:20-24; Larkin, 55:18-21).

66.     While on part-time FMLA, Ruiz worked four-hour days from 10:00-2:00 initially, and then 6:00-10:00 to be able to attend evening functions.  During those four hours, Shelley required Ruiz to prepare a journal reflecting work performed each day which took at least 20-30 minutes, and Shelley would advise they were not detailed enough and she was not using her four hours appropriately.  (Ruiz, 91:8-19; 92:13-17;108-109:22-25; 110-111:1-1).

67.     There were times Ruiz worked more than her four hours that Shelley refused to pay her for. When she worked the evening hours and attended night functions, Shelley still required her to perform her other duties. (Ruiz, 92-93:2-6).

68.     When Ruiz was scheduled to return to work full time, her physician, Dr. Sheets, submitted a letter to HR that Ruiz needed to remain on part-time longer due to her anxiety. Shelley accused Ruiz of not providing timely notice when HR had actually received Dr. Sheets' letter days prior.  (Ruiz, 93-94:22-18; 107-108:7-15).

69.     Following the two Equity Complaints alleging harassment against her and the resulting investigation, Shelley called Ruiz in for her mid-year evaluation on March 5, 2018 while Ruiz was still on part-time FMLA and kept her over her four hours at which time she was asked to review seven areas of concern.  Shelley completed a handwritten "paper" evaluation.  Shelley admits this meeting could have waited and possibly would have been more appropriate following Ruiz' return from FMLA full time on March 12, 2018.  (Ruiz, 94:19-22; 119-120:12-2; 148-149:15-20; Shelley II, 267:19-24; 268:16-23; 269:9-20).

70.     At the March 5, 2018 "paper" evaluation meeting, Shelley agreed to meet with Ruiz in April to review some of the areas of concern and to meet in May to discuss the remaining

concerns and issued a memorandum on March 23, 2018, the day before Spring Break, concerning the March 5, 2018 meeting.    (Ruiz, 121-122:9-13; Shelley II, 275:12-17; Ex. 28).

71.     Shelley based her "paper" evaluation on the time periods from July 1, 2017-October 27, 2017 and January 29, 2018-March 5, 2018.  Ruiz was out on FMLA leave from October 28, 2017-January 28, 2018.  During the January 29-March 5, 2018 period, Ruiz was working part-time four-hour days.  Harayda had advised  Shelley that the time Ruiz was not working should not count in any considerations of performance because the person was not there for her to see her do her job.  Shelley admitted to not having a lot of training regarding the FMLA and that there are probably some particulars that she is not privy to. (Shelley,13:7-13; 15:13-16; Harayda, 24:1-10; Shelley II, 295-296:25-17; ).

72.     Following the meeting with Shelley, Ruiz spent her entire spring break, in anticipation of meeting with Shelley, reading the necessary books and gathering evidence and prepared an outline showing that the ineffective ratings were incorrect. (Ruiz, 120:1-13; Shelley II, Ex. 29).

73.     Shelley completed the "paper" evaluation by hand and claims it resulted in a "Needs Improvement" rating.  However, Ruiz pointed out that she had miscalculated the values.  Even with the unwarranted low ratings, when the domains were tallied properly using the FSLA Metric Calculation System, and given appropriate weight, the paper evaluation yielded an "Effective" rating.  When Ruiz received her final evaluation on June 12, 2018, she discovered in Domain 2 that two proficiency areas, 4 and 10, that had always been rated as "Effective" had been changed to "Needs Improvement".  Domain 2 is 40% of the overall final evaluation.  Dr. Shelley lowered proficiencies 4 and 10 so that the now "Effective" evaluation would lower to "Needs Improvement" thus justifying her retaliatory decision to non-renew Ruiz. (Shelley II, 282:21-24; 343-344:4-1; 346:13-23; 348:14-20; Exs.29, 32).

74.     When Shelley and Ruiz met in April 2018, Shelley refused to change the  incorrect

ratings with the exception of two, regarding organization and commitment, since they were

obvious strengths of Ruiz'.  At the meeting, Shelley advised Ruiz she was unable to meet again

in May due to a deadline.  Ruiz was unable to present her work pertaining to proficiencies 6,7,

and 9.  Although Shelley denies it, Shelley advised Ruiz that she had already made the

determination to non-renew her administrative contract.  (Ruiz, 120-121:17-8; Shelley II, 279:4-

10; 319-:1-12; 322:13-17; Ex. 30; 325:3-10; Ex. 32).

75.     For nonrenewal of administrators, a list is circulated and a box is checked either yes or no

as to renewal.  This form is due back to HR in April, but it is not a "hard deadline".  However,

Shelley claimed she could not meet with Ruiz in May 2017 due to the April deadline.  (Cantees,

69:1-7; Shelley II, 94:4-10).

76.     Bowden claims, regarding non-renewal of assistant principals, that principals, rather than

having sole and exclusive authority to non-renew, make a recommendation to Roy Sprinkle,

Executive Director of HR.  Cantees is then consulted and the Board has the final decision

making authority. Shelley claims the decision to non-renew Ruiz was her decision and no one

else was involved. (Bowden, 34:9-23;Shelley II, 13-17).

77.     The other administrators who were nonrenewed simultaneously with Ruiz were due to a

DUI; due to having a party with students and alcohol; due to a domestic violence issue; and one

who had been on probation for two years.  (Ruiz, 189:7-20).

78.     With regard to Ruiz, Shelley and Cantees had the option to renew, non-renew or transfer.

APs are transferred every year.  Despite Cantees being "a big fan" of Ruiz, Shelley and Cantees

did not consider recommending transfer despite all of Ruiz' experience, years with the district

and qualifications. (Harayda, 12:12-18; Cantees, 21:1-7;30:7-16; 38:24-25; 83:11-13).

79.     Following her non-renewal, a position became available at STC as a CTE program specialist.  Ruiz used to supervise that position when she was Assistant Director at STC.  She interviewed but was not selected because the interviewers feared Bowden. (Ruiz, !53-157:20-12).

80.     Ruiz is unable to obtain an administrative position anywhere else in the state due to her non-renewal.  (Ruiz, 186:2-4; 207-208:10-22).

81.     Due to the retaliatory "Needs Improvement" evaluation given by Shelley in 2018, Ruiz was denied her retroactive pay raise in 2018. (Ruiz, 198:2-19).

82.     Following Ruiz' non-renewal, there was a Teacher Trainer position Ruiz was interested in and qualified for.  When she was in the staffing process for the position,  Alberts attempted to modify the job description adding ESE qualifications that Ruiz did not possess.  Lempe refused to sign off on the job description and instructed Alberts to get Ruiz qualified in the new ESE qualifications and told her this sounds like blatant retaliation.  Alberts and Cantees are very good friends and went "hand in hand, step in step" with  Kingsley. (Lempe, 49-53:1-24; Rose, 18:1-5).

83.     Ruiz' projected economic losses, reduced to present value, are calculated in the range of $1,046,033 to $1,148,191 per Joyce H. Eastridge, Economist.  (Ruiz Dec.¶19).

84.     Due to the retaliatory nonrenewal of Ruiz' administrative contract, in addition to loss of income, she has suffered loss of insurance benefits, FRS benefits, personal and sick time and 401K contributions.  (Ruiz, 200-206:24-5).

Respectfully submitted,

*/s/M. Michele Leach-Pachinger*
M. Michele Leach-Pachinger, Esq.
Leach-Pachinger Law & Mediations, PLLC
Florida Bar No.:  007110
4112  53rd Avenue East, #20802
Bradenton, FL  34204

Tele:    (941) 752-2240
Fax:     (888) 506-3410
mlp@lplaw-mediations.com
AND
*/s/ Craig L. Berman*
Craig L. Berman, Esq.
Berman Law Firm, P.A.
Florida Bar No.: 0068977
111 2nd Ave., Suite 706
St. Petersburg, FL 33701
Telephone No.: (727) 550-8989
Facsimile No.:  (727) 894-6251
Craig@bermanlawpa.com

TRIAL COUNSEL FOR PLAINTIFF

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the foregoing has been e-filed via the CM/ECF system which will furnish copies via email to:

mccrear@gtlaw.com and pagec@gtlaw.com.

DATED this 18th day of November, 2019.

By:    *s/ M. Michele Leach-Pachinger*
          M. Michele Leach-Pachinger, Esq.

21