# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**LYNA JIMENEZ-RUIZ,**

        **Plaintiff,**

**vs.**                                      **Case No.: 8:18-cv-01768-WFJ-AEP**

**SCHOOL BOARD OF SARASOTA
COUNTY,**

        **Defendant.**

_____/

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, LYNA JIMENEZ-RUIZ, by and through her undersigned counsel, hereby files this

Memorandum in Opposition to Defendant's Motion for Summary Judgment ("MSJ").  Plaintiff

incorporates her Statement of Disputed Facts ("SDF ¶ ___ ").

## I.      SUMMARY JUDGMENT STANDARD

A motion for summary judgment should be granted only if the "movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). The focus must be "whether the evidence presents a sufficient disagreement

to require submission to a jury or whether it is so one-sided that one party must prevail as a matter

of law." Anderson v. Liberty Lobby, 477 U.S. 242, 251–52 (1986). The moving party has the initial

burden of identifying those portions of the record establishing "the absence of a genuine issue of

material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). At summary judgment, district

courts "must draw all reasonable inferences in favor of the nonmoving party, and it may not make

credibility determinations or weigh the evidence." <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 120 S. Ct. 2097, 2110 (2000).  District courts must "disregard all evidence favorable to the moving party that the jury is not required to believe." <u>Id</u>. at 2102.

## II.    RISE AND FALL OF TODD BOWDEN

Bowden commenced employment with the Sarasota County School District in 2007 as Director of the Sarasota County Technical Institute (Bowden 14). At the time of his sexual harassing conduct in July 2015, Bowden was the Executive Director of Career, Technical and Adult Education reporting directly to then Superintendent Lori White (Cantees 24).

In October 2016, Bowden was selected by the school board to replace Lori White as school superintendent upon her planned retirement which took place on March 1, 2017 (Bowden 4-5). Before his selection as superintendent, Scott Lempe recommended to White and school board counsel Art Hardy that Bowden's sexual harassment of Plaintiff be investigated (Lempe 10, 32-33).

After his selection, Bowden initially decided not to renew Lempe's employment contract as an administrative employee and informed him that he had failed to advocate enough for Bowden to be selected (Lempe 11-12).  Lempe's contract was renewed but Bowden held a grudge and did not believe Lempe was "loyal" (Lempe 14). Lempe reported directly to Bowden and retired early in part because Bowden's moral compass was pointed in the wrong direction (Lempe 15-16). Bowden created a "boys club" which disturbed Lempe (Lempe 18-20). Lempe testified that Bowden absolutely is manipulative and a master self-preservationist (Bowden 37).

Bowden coldly informed Karen Rose after he became Superintendent that "he had no problem letting anyone go for any reason" and it would not "bother him one bit." (Rose 11-12). Bowden was consumed with power and control (Rose 12).

After Bowden was elevated to Superintendent, he created three assistant superintendent positions that reported directly to him.  Bowden promoted Laura Kingsley from her former position as Executive Director of Elementary Schools to Chief Instructional Officer (Rose 9-10, 13). As Chief Instructional Officer, Kingsley conducted weekly executive director meetings in which she and others would discuss employees in the schools on the "good," "bad" or "hit lists" (Rose 14, 19). These weekly meetings targeted school principals and other high-level administrative employees including her peer, Scott Lempe, Chief Operating Officer (Rose 14: 21-24, 17, 26). Kingsley's subordinate, Steve Cantees, Executive Director of High Schools (Rose 17:18-25), bought in and never dissented (Rose 18:4-7). Cantees was in complete lockstep with Kingsley (Rose 18-19, 26:16-25), and drank the kool-aid (Lempe 41).  Bowden and Kingsley created a culture of fear and hostility to any dissent (Rose 11:8-16, 36).

Kingsley would not associate with those on the hit list, including one black middle school principal where Bowden's son was attending (Rose 20:8-10). Rose informed Bowden that she believed Kingsley was engaged in racial discrimination (Rose 22). Kingsley learned of the disclosure and was upset with Rose (Rose 22-23). Eventually, Rose was reassigned to "special projects" 17 months before DROP date with Bowden's approval (Rose 32-33). Kingsley knew how Bowden was thinking and she propagated "high-skilled, refined messaging" (Rose 15:22). Kingsley's subordinates were in fear and went to Kingsley to receive guidance on mundane issues (Rose 16:20-23). Kingsley would also inform Rose that certain of Rose's subordinates were not meeting expectations through refined and constant "messaging" (Rose 37).

Kingsley's weekly executive director meetings also addressed black high school principals and the "low" survey scores from staff (Rose 50:16-22, 53).  Rachel Shelley was expressly included

in Kingsley's discussion of survey scores for black high school principals (Rose 51:8-14). Shelley and other black school principals were the subject of disrespectful comments behind their back as to how the school district was "having to put with them" (Rose 51:18-21). Cantees discussed how he resented having to tolerate Shelley (Rose 53).  But to her face, Cantees was respectful to Shelley (Rose 53:10-11). Someone mockingly questioned how Shelley was "principal of the year." (Rose 53:23-25).  There was no process to designate Shelley (Rose 54). Shelley would know her staff gave her low ratings (Rose 55:8-15).

Lempe's replacement as chief operating officer, Jeff Maultsby, engaged in sexually harassing behavior which finally resulted in Maultsby being terminated and Bowden's impending forced departure as superintendent in November 2019 for failing to take action in response to Charaina Bonner's sexual harassment complaints against Maultsby (Lempe 23-24, 25-27).[1]  Maultsby was mentored by Lempe for a brief period during which Maultsby told Lempe, "Todd is my boy. My job is to protect him." (Lempe 28-29).  Maultsby made a threat of violence by sending Bonner a link to a news article where a whistleblower was murdered (Lempe 27, 29-30). Maultsby sent a text message to Bonner that "Snitches get stitches." (Lempe 27).

## III.   PLAINTIFF'S TRANSFER TO BOOKER HIGH SCHOOL ("BHS") IN MAY 2016 WAS MATERIALLY ADVERSE AND AN ACT OF HOSTILITY

In the spring of 2016, Plaintiff was initially asked if she had an interest in returning to Pine View (Cantees 28). During the end of the 2015-16 school year, Steve Cantees, then Executive Director of High Schools, met with Karen Rose, then Executive Director of Middle Schools, and requested that Rose accept a transfer of Plaintiff from STC to a middle school under Rose's control

---

[1]https://www.heraldtribune.com/news/20191111/sarasota-superintendent-todd-bowden-accepts-offer-will-step-down-if-board-approves

(Rose 6:4-13). Bowden was present for this discussion and informed Cantees, "**No, she's not. You are**" (Rose 7:1-6). Thus, before Bowden was even hired as superintendent, he was exerting power to force Plaintiff's transfer to a high school whose principal was viewed as a "bitch." Cantees tried to prevent it but submitted to Bowden. Rose was amazed by Cantees' submission to Bowden's demand (Rose 8: 1-8).

Paragraph 10 of Plaintiff's Declaration states: "When I was packing my office to transfer to BHS, Dr. Bowden said '**We will see how you do with that bitch**.' This was very upsetting as it further indicated his retaliatory intent." A transfer to a different position can be "adverse" where it involves a reduction in pay, prestige or responsibility. See Doe v. Dekalb County Sch. Dist., 145 F.3d 1441, 1448 (11th Cir. 1998). "Factors to consider in determining whether a transfer amounts to a materially adverse action include whether the new position is more arduous, carries greater prestige, or is considered an objectively better job by other employees." Windham v. Barr, 2019 WL 1412119, at *11 (S.D. Ga. 2019).[2] "A transfer to another location, even if the job remains the same, can upset these reliance interests and thereby discourage a reasonable employee from complaining about sexual harassment." Lloyd v. Housing Authority of the City of Montgomery, Ala., 857 F.Supp.2d 1252, 1268 (M.D. Ala. 2012).

A jury can conclude that working for Shelley was "punishment." Plaintiff was essentially transferred from her assistant director position to a testing coordinator position. Executive

---

[2]Even if the 365-day FCRA statute of limitations bars the retaliatory transfer claim as a discrete act, it is still part of the hostile work environment. Plaintiff will discuss the transfer because it is also background evidence in support of her timely non-renewal claim. Farrow v. King & Prince Seafood Corporation, 2018 WL 6206122, at *5 (S.D. Ga. 2018). A plaintiff can use past evidence of the employer's discriminatory conduct to meet her burden of persuasion in a circumstantial evidence case. Turlington v. Atlanta Gas Light Co., 135 F.3d 1428, 1432 (11th Cir. 1998); Ross v. Rhodes Furniture, Inc., 146 F.3d 1286 (11th Cir. 1998).

management knew that Shelley received low ratings from employee surveys. Cantees informed

Shelley that Plaintiff was being transferred to BHS.  Shelley had no prior knowledge of Plaintiff's

skill set and was not provided a resume for Plaintiff (Shelley 104-05). While Shelley was happy to

get a testing coordinator and "extra assistance and support" (Shelley 105:2-5), Shelley was also

"shocked and somewhat surprised." (Shelley 104:15-20). Shelley admits that Plaintiff's transfer to

BHS placed Plaintiff into an "awkward" posture (Shelley 124).

## IV.    PLAINTIFF PLACED ON BOWDEN'S HIT LIST

Rose testified:

> Q.    Have you ever heard Lyna referred to as being on a hit list of any kind?
>
> A.    I did not refer to -- I -- there was a conversation about Lyna's status and -- and being nonrenewed, but I didn't have to have anyone reference Lyna. **It became apparent to me as time went on** -- and I will tell you, it wasn't my agenda. I can't even right now tell you that I know Lyna's correct last name. The -- **it became apparent to me, through the hiring process of superintendent -- that's when I started to put one and one equals two, and things tarted coming together for me.**
>
> Because my agenda, in order to have the success that I had in my career and to -- you had to stay -- I called it keeping your eye on the ball. And I, with my experience, knew that if my eye wasn't on the ball, there was a cost to it. I kept my eye on what I was responsible for, accountable for to my children and my families and my staff.
>
> It became apparent, in my peripheral vision, that when things -- **when we hit the superintendent hiring process**, that Lyna became a person that -- I could not tell you what she looked like. **But as time went on, it became apparent to me, with all the other folks on the hit list, that that individual called Lyna** -- I went -- actually went home and told my husband, "It wasn't good enough that they demoted her. It wasn't good

enough that -- that -- that Todd Bowden wasn't -- it wasn't substantiated or unsubstantiated, just leave well enough alone, let who is described as a -- as a high-performing, good employee, it -- it was continue to dismantle.

Because I was privy to conversations that -- I can't tell you specifically what they were, but there was no place for this individual after they were nonrenewed, trying to find a -- the first conversation was with Laura and Steve, that Rachel wanted to nonrenew her in front of me. And then it went to, when staffing occurred, that there wasn't -- the translation was there was no place for her to go.

(Rose 57-59).

Rose also testified: "**When Todd Bowden was in the hiring process** and people started testifying and it became a controversy, that's when I realized that Lyna -- that's when I -- in my mind, I went back to that." (Rose 63:16-21; see also Rose 71).  Paragraph 13 of Plaintiff's Declaration states: "During my deposition, I testified that my relationship with Dr. Shelley was good until Dr. Bowden took office as Superintendent. I was confusing the voting in of Dr. Bowden with him actually taking office. My relationship with Dr. Shelley actually began to deteriorate after he was voted in as Superintendent in October 2016 and worsened further following him taking office in March 2017."

Cantees advised Shelley to "**document**" issues with Plaintiff and this advice was given "**early on**" (Cantees 87:10-17). Indeed, Shelley copied Cantees on a Letter of Instruction provided to Plaintiff in May 2017 (Shelley I, 95). Karen Rose was surprised that Kingsley and Cantees discussed in her immediate presence that a specific plan had been adopted to not renew Plaintiff for 2018-19 school year (Rose 60). The specific plan not to renew Plaintiff's contract was in place by early December 2017, before the end of fall semester (Rose 62-63). This discussion took place even

before letters are typically sent to administrators warning them if they are at risk of non-renewal

(Rose 64:20-23).  Cantees testified:

> Q.     Did you and Dr. Shelley ever discuss at any review of Dr. Shelley whether she was maintaining adequate documentation on Lyna?
>
> A.     Yes.
>
> Q.     And can you tell me roughly when?
>
> A.     I would say probably beginning in December.

(Cantees 88).

Cantees did not ask Shelley if she was documenting other employees at BHS (Cantees 89). When asked about employees on the hit list, Rose testified that there was a discussion in the executive staff meetings about Plaintiff not being renewed (Rose 57:16-25). Rose testified that Plaintiff was on the "hit list." (Rose 58:9-18). Plaintiff's allegations of sexual harassment against Bowden were informally discussed before the weekly executive director meetings formally commenced (Rose 64). The plan was not only to not renew her as an assistant principal but to prevent her from any obtaining any administrative position in the district despite Plaintiff's status as an otherwise tenured teacher (Rose 58:21-25; Lempe 48-51). There was an attempt to alter a teacher-trainer position description to exclude Plaintiff from qualifying and Lempe rejected the change (Lempe 50:20-25).  Lempe viewed the proposed change as "blatant retaliation." (Lempe 53).

## IV.    TIME-BAR DEFENSE NOT APPLICABLE TO HOSTILE ENVIRONMENT CLAIM UNDER CONTINUING VIOLATION THEORY

Plaintiff dual-filed her first charge on December 20, 2017 with the EEOC and FCHR. Defendant argues that any conduct before February 24, 2017 is barred by the 300-day limitations

period. Plaintiff disagrees. The FCRA has a 365-day limitations period. In any event, Plaintiff was subjected to a continuing hostile environment based on sex since July 2015 and into the 365-day period. Plaintiff also suffered discrete acts within the 365-day limitations period including placement on the "hit list" in early December 2017.

Below are non-discrete and discrete acts referenced in the SDF that extended into the 365-day period:

- Sexual harassment before and sexual advance made and rejected in July 2015 (SDF ¶¶ 4-7).

- Enlarged Plaintiff's duties after sexual advance rejected and took away her authority to approve purchase orders and sign checks (SDF ¶ 8).

- Bowden confronts Plaintiff about Plaintiff's disclosure of being sexually harassed on February 22, 2016 and tries to intimidate Plaintiff (SDF ¶ 9).

- On February 22, 2016, Roy Sprinkle from HR advises employees who file equity complaints to leave the district (SDF ¶ 11).

- Bowden gives Plaintiff a "needs improvement" evaluation in spring 2016 (SDF ¶ 12).

- Plaintiff removed from PNP program in spring 2016 based on Bowden's negative performance review (SDF ¶ 13).

- Plaintiff advised by trusted mentor that an equity complaint would damage her future (SDF ¶ 14).

- Plaintiff invited to consider transfer to Pineview in April 2016 but Bowden advises principal of Pineview that Plaintiff was difficult to work with and blocked the transfer (SDF ¶ 17).

- Plaintiff transferred to a lower position at BHS in May 2016 with an assistant principal title and Bowden was present (SDF ¶¶ 18-20).

- In August 2016, Plaintiff reports Bowden's sexual harassment to Shelley resulting in an investigation of her claims (SDF ¶¶ 24-27).

- The Joshi report was issued in October 2016 on the same evening Bowden is selected as superintendent (SDF ¶ 28).

- After Bowden takes office on March 1, 2017, he creates a toxic "boy's club" environment and a "hit list" that includes Plaintiff (SDF ¶¶ 30-32, 36).

- Near the end of 2016, Shelley advised Plaintiff that her contract would be renewed for 2017-2018 (SDF ¶ 38).

- Plaintiff takes medical leave for PTSD and major depression on October 28, 2017 (SDF ¶¶ 53-54).

- On October 31, 2017, Shelley starts removing Plaintiff's duties and states that Plaintiff was not returning (SDF ¶ 54).

- After Plaintiff needs to extend her FMLA leave on November 13, 2017, Shelley sends a letter expressing concerns regarding Plaintiff's performance that Plaintiff receives on November 28, 2017 while on FMLA leave (SDF ¶ 55).

- On November 14, 2017, Shelley announced reassignments effective immediately even though Plaintiff was scheduled to return to work on November 28, 2017 (SDF ¶ 56).

- Near the end of 2017, it was decided that Plaintiff was on the "hit list" and would not be renewed (SDF ¶ 61).

Under Title VII, an EEOC charge predicated upon a discrete act must be filed within 300 days of the discrete act. A distinction is made between discrete acts and those alleging a continuing violation. When the allegedly unlawful employment practices amount to a continuing violation, the time period for filing an EEOC charge does not begin until the last occurrence of the discrimination. National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 118 (2002). The "discriminat[ion]" prohibited by Title VII includes the creation of a hostile work environment. See Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65–66 (1986). Hostile work environment claims "are based on the cumulative effect of individual acts." McCann v. Tillman, 526 F.3d 1370, 1378 (11th Cir. 2008). And it does not matter that some of the component acts of the hostile work environment fall outside the statutory time period. Nat'l R.R. Passenger Corp., 536 U.S. at 117. Provided that an act (discrete or non-discrete) contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability. Id.

A jury can consider discrete acts as a component of a hostile work environment claim. Gowski v. Peake, 682 F.3d 1299, 1313 (11th Cir. 2012). Moreover, "[w]here the discrete act is sufficiently related to a hostile work environment claim so that it may be fairly considered part of the same claim, it can form the basis for consideration of untimely, non-discrete acts that are part of the same claim." Chambless v. La.-Pac. Corp., 481 F.3d 1345, 1349–50 (11th Cir. 2007). "The pivotal question is whether the timely discrete acts are sufficiently related to the hostile work environment claim." Id. at 1350.

## V.      SUMMARY JUDGMENT SHOULD BE DENIED ON THE TITLE VII AND FCRA HOSTILE ENVIRONMENT CLAIM

To establish a hostile work environment claim under Title VII, the plaintiff must show that

"the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). Plaintiff's SDF establishes she endured unwelcome sexual advances, hostile work conditions and retaliation over a span of three-years. Plaintiff's transfer to work for Shelley culminated in a diagnosis of PTSD and depression. Plaintiff has suffered severe emotional distress from her toxic working conditions. Plaintiff's career has been destroyed.

## VI.    SUMMARY JUDGMENT SHOULD BE DENIED ON THE TITLE VII AND FCRA NON-RENEWAL CLAIM

### A.    Prima Facie Case

Obviously, non-renewal is materially adverse. To establish a prima facie case of retaliation, a plaintiff must show (1) that she engaged in statutorily protected expression; (2) she suffered a materially adverse action; and (3) the action was causally related to her statutorily protected activities. 42 U.S.C. § 2000e-3(a); Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).[3]

As a new employee at BHS, Plaintiff expressed concern to Shelley about being renewed for 2017-18 because of her equity complaint against Bowden. Towards the end of 2016, Shelley advised Plaintiff that her contract would be renewed for 2017-18 (SDF ¶ 38). Plaintiff was renewed after her first year at BHS and received an evaluation that was rated "effective" and may have been rated

_____

[3]A plaintiff is only required to show that a "good faith, reasonable belief" that she was the victim of hostile work environment sexual harassment. Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997). A person who rejects a supervisor's sexual advances has engaged in protected activity. Village of Tequesta v. Luscavich, 240 So.3d 733, 742 (Fla. 4th DCA 2018); EEOC. v. New Breed Logistics, 783 F.3d 1057, 1061 (6th Cir. 2015); Ross v. Baldwin County Bd. of Educ., 2008 WL 820573, at *6 (S.D. Ala. 2008).

"highly effective" if Shelley had taken Plaintiff's response into account (Shelley I, 122-23).

Bowden was selected as superintendent in October 2016 but did not have an opportunity to retaliate against Plaintiff until he took the reigns as superintendent beginning March 1, 2017.  Even though Bowden was selected as of October 2016, Cantees caused Plaintiff to be renewed in December 2016 for the 2017-18 school year because it would be too suspicious to terminate Plaintiff after only 6 months in a new job for which she was never trained. Cantees also played a central role in Plaintiff's non-renewal for the 2018-2019 school year as shown by his demands for documentation.

Causation is established by the "first opportunity to retaliate" rule.[4] Evidence of a pattern of antagonism can also show a causal connection. Farrell v. Planters Lifesavers Co., 206 F.3d 271 (3d Cir. 2000).  To establish a causal connection, "we require a plaintiff only to demonstrate 'that the protected activity and the adverse action were not wholly unrelated." Farley v. Nationwide Mutual Insurance Company, 197 F.3d 1322, 1337 (11th Cir. 1999). A causal connection exists even as to retaliatory acts occurring long after the protected activity, where those events are temporally linked by a chain of intervening retaliatory acts. See Bass v. Board of County Comm'rs, Orange County, Fla., 256 F.3d at 1117-19 (11th Cir. 2001).

---

[4] See Ford v. GMC, 305 F.3d 545 (6th Cir. 2002) (gap between protected activity and adverse action did not refute causal connection because plaintiff was under the control of a different supervisor during the gap); Porter v. California Dep't of Corr., 419 F.3d 885, 895 (9th Cir. 2005) (delay between the protected activity and the adverse action not too remote because fellow employee could not retaliate until after he was promoted to a supervisory position); Dale v. Wynne, 497 F. Supp. 2d 1337, 1345-46 (N.D. Ala. 2007) (finding that an extended time gap did not defeat the causal connection because the plaintiff was not subject to adverse treatment until she returned to work after a leave of absence).

**B.**     <u>Pretext: Non-Renewal Decision was Made before December 2017</u>

Plaintiff's mere presence on the "hit list" is a retaliatory act.  Defendant was lying in wait for a pretext.  <u>See</u> <u>Cleveland v. Home Shopping Network, Inc.</u>, 369 F.3d 1189, 1193 (11th Cir. 2004) (decisionmaker was lying in wait for opportunity to discriminate). Plaintiff was placed on the hit list even as she was being transferred to BHS (Rose 71).

A jury could infer that Shelley's actions were dictated by Bowden acting through Kingsley and Cantees. The "battle plan of the admiral is a valid datum in assessing the intentions of the captain of a single ship in the flotilla." <u>Travers v. Flight Services & Systems, Inc.</u>, 737 F.3d 144, 147 (1st Cir. 2013). <u>See</u> <u>also</u> <u>Lockhart v. Westinghouse Credit Corp.</u>, 879 F.2d 43, 54 (3rd Cir. 1989) ("When a major company executive speaks, 'everybody listens' in the corporate hierarchy"). The jury can infer that Shelley was directed to and joined the final decision to retaliate and non-renew Plaintiff in December 2017, well before the final annual performance review in April 2018.

Any performance "review" conducted after Plaintiff was placed on the hit list is irrelevant and cannot be articulated as legitimate, non-retaliatory reason for the non-renewal. <u>See</u> <u>Lloyd v. Georgia Gulf Corp.</u>, 961 F.2d 1190, 1197 (5th Cir. 1992) ("evidence of Lloyd's performance that did not affect Marshall's decision" was irrelevant). The "true" motive for the discharge could only be determined based on the precise moment when Plaintiff was placed on the hit list with her direct cooperation. <u>See</u> <u>Crapp v. City of Miami Beach</u>, 242 F.3d 1017, 1020 (11th Cir. 2001). Shelley could not be motivated by knowledge she did not then have. <u>See</u> <u>Turnes v. Amsouth Bank, N.A.</u>, 36 F.3d 1057, 1062 (11th Cir. 1994). A jury cannot credit reasons unless those reasons are relied upon by the decision-maker. <u>See</u> <u>IMPACT v. Firestone</u>, 893 F.2d 1189, 1194 (11th Cir. 1990). "It is beyond the province of a trial or a reviewing court to determine – after the fact –  that certain facts in the record

might have served as the basis for an employer's personnel decision." Uviedo v. Steves Sash & Door Co., 738 F.2d 1425, 1429 (5th Cir. 1984).

In Glisson v. Interim Healthcare, Inc., 2000 U.S. Dist. LEXIS 12792 (M.D. Fla. 2000), the district court denied the defendant's motion for judgment as a matter of law because the evidence showed that the employer was planning to get rid of the plaintiff for "nearly a year" before it articulated "poor performance" as the reason for discharge. The district court held that the defendant's plan to get rid of the plaintiff showed that the defendant's proffered explanation for discharge was "irrelevant" and not the motivating cause of the discharge.

Similarly, in Ryther v. Kare 11, 108 F.3d 832 (8th Cir. 1997), the jury found that the plaintiff sportscaster was discharged due to age where the employer had already decided to discharge the plaintiff before it commissioned a market research survey on which it attempted to justify its decision. The jury verdict was sustained because the survey played little or no role in the discharge decision.  In Townsend v. Kemper Nat'l Ins. Cos., 294 F.3d 1232 (10th Cir. 2002), the court ordered a new trial where the defendant decided to "get rid of" the plaintiff and even took him out of the budget before the event which formed the basis of the purported non-discriminatory reason for discharge.

C.   **Non-Renewal Based on Fabricated Concerns**

Shelley cannot claim an "honest" belief in her own retaliatory acts against Plaintiff after Plaintiff filed an equity complaint against her.  Shelly subjected Plaintiff to a hostility and took away her duties after she was diagnosed with PTSD and major depression.[5] Shelley was under a deadline

---

[5]"An employer may not benefit from the distinction drawn between an employer's belief that an employee committed a work rule violation and the factual accuracy of that belief when the actual predicate of such a belief is the personal knowledge of the decisionmaker. In such cases, the inquiry

to non-renew Plaintiff and incorrectly weighted the scores on certain categories in arriving at the overall results of the performance evaluation she used to justify non-renewal; even using Shelley's scores, however, Plaintiff should have been rated "effective" (SDF ¶ 73). Shelley's concerns about Plaintiff after Plaintiff was placed on the hit list are pretextual.

## VII.  DEFENDANT IS LIABLE FOR INTERFERENCE WITH PLAINTIFF'S FMLA RIGHTS UNDER A STRICT-LIABILITY STANDARD

The FMLA entitles an eligible employee to a total of twelve weeks of leave during any twelve-month period because of the employee's own serious health condition if the employee is unable to perform job functions. 29 U.S.C. § 2612(a)(1).  After the period of qualified leave expires, the employee is entitled to be reinstated to the former position or an equivalent one with the same benefits and terms of employment that existed prior to the exercise of the leave.  See 29 U.S.C. § 2614(a). Shelley removed duties from Plaintiff just after she commenced medical leave in October 2017.  Shelley announced Plaintiff would not be returning even though she was supposed to return on November 28, 2017. Defendant had no plan to restore Plaintiff's duties when her leave was scheduled to end.

The non-renewal decision was based on a partial year performance evaluation which did not account for and thus penalized Plaintiff for taking protected FMLA leave. See Gostola v. Charter Communications, LLC, 72 F.Supp.3d 796, 801 (E.D. Mich 2014) ("Charter explicitly used data from the period in August and September 2013 during which she was on FMLA leave when it determined that her revenue figures were low enough to warrant termination.").  Defendant violated the FMLA

into the factual accuracy of events merges with the ultimate question of truthfulness because a lie as to one suggests a lie as to the other." Strickland v. Prime Care of Dothan, 108 F. Supp. 2d 1329, 1333-34 (M.D. Ala. 2000) (emphasis added).

by not adjusting its "performance" expectations to take into account Plaintiff's protected FMLA-qualifying absences. See Pagel v. TIN Inc., 695 F.3d 622, 629 (7th Cir. 2012).  In Lewis v. School District # 70, 523 F.3d 730 (7th Cir. 2008), the court reversed summary judgment for the employer on an interference claim where the employee offered evidence that her employer had expected her to complete all the duties of a full-time bookkeeper while she was taking intermittent FMLA leave, and then fired her for failing to meet that full-time standard. Id. at 736–37. Because the performance shortfalls were a direct result of her FMLA leave, termination for those reasons would have made her FMLA leave "illusory." Id. at 743.[6] Interference claims are governed by a strict-liability standard; thus, an interference plaintiff in the Eleventh Circuit does not bear the "increased burden" imposed on retaliation plaintiffs of showing pretext.  Strickland v. Water Works & Sewer Board, 239 F.3d 1199 (11th Cir. 2000). "When an employer attaches negative consequences to the exercise of protected rights, it has 'chilled' the employee's willingness to exercise those rights because he or she does not want to be fired or disciplined for doing so." Stallings v. Hussmann Corp., 447 F.3d 1041, 1050 (8th Cir. 2006). "If an employer takes an employment action based, in whole or in part, on the fact that the employee took FMLA-protected leave, the employer has denied the employee a benefit to which he is entitled." Wysong v. Dow Chemical Co., 503 F.3d 441, 447 (6th Cir. 2007). Summary judgment must be denied because leave cannot be a negative factor in job assignments or

---

[6]In Wojan v. Alcon Laboratories, Inc., 2008 WL 4279365, at *4 (E.D. Mich. 2008), the employer violated the FMLA by holding a salesperson to the "same quota" and evaluating her performance to include time period during which she was absent on FMLA leave. That FMLA leave caused the plaintiff to have a poor performance score. The poor performance score caused her to be placed on a PIP.  The plaintiff prevailed because the initial violation set in motion an unbroken chain of events resulting in her termination. The court found that the defendant's failure to adjust its expectations was "in direct contravention of FMLA provisions which prohibit the taking of FMLA leave as a negative factor in employment actions."

performance reviews.

## VIII.  SUMMARY JUDGMENT IS NOT PROPER AS TO FMLA RETALIATION CLAIM

Plaintiff has direct and indirect evidence to preclude summary judgment in favor of Defendant. "When a plaintiff asserts a claim of retaliation under the FMLA, in the absence of direct evidence of the employer's intent, we apply the same burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), for evaluating Title VII discrimination claims." Strickland v. Water Works & Sewer Bd., 239 F.3d 1199, 1207 (11th Cir. 2001) (bolding added). To state a prima facie case, an employee must allege that: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment decision; and (3) the decision was causally related to the protected activity. Parris v. Miami Herald Publ'g Co., 216 F.3d 1298, 1301 (11th Cir. 2000). Plaintiff was stripped of her Assistant Principal duties almost immediately after she commenced medical leave for PTSD and major depression in October 2017 and Shelley communicated that Plaintiff would not be returning. Summary judgment should be denied as to the retaliation claim.

## IX.  ANALYSIS OF DISCRIMINATORY MOTIVE

A plaintiff can establish that the employer's stated reason is pretextual through a variety of forms of evidence and a plaintiff may not be forced to pursue any particular means of demonstrating pretext. Patterson v. McLean Credit Union, 491 U.S. 164, 187-88, 109 S.Ct. 2363 (1989). A plaintiff can establish pretext with evidence of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's rationale." Holland v. Gee, 677 F.3d 1047, 1055-56 (11th Cir. 2012). The Supreme Court has held "it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." Reeves v. Sanderson Plumbing

-18-

Products, Inc., 530 U.S. 133, 146 (2000) (italics in original).

To establish pretext, a plaintiff may show either that (1) the proffered reason had no basis in fact, (2) the proffered reason did not actually motivate the employment decision, or (3) the reason was insufficient to motivate the employment decision. Walker v. NationsBank of Florida, 53 F.3d 1548, 1564 (11th Cir. 1995) (Johnson, J., concurring).  The plaintiff can also establish pretext with evidence of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's rationale." Holland v. Gee, 677 F.3d 1047, 1055-56 (11th Cir. 2012).

"[B]ackground evidence may be critical for the jury's assessment of whether a given employer was more likely than not to have acted from an unlawful motive." Estes v. Dick Smith Ford, Inc., 856 F.2d 1097, 1103 (8th Cir. 1984). "[D]iscriminatory motive regarding one employment decision may be used as evidence of that decisionmaker's discriminatory motive in making a similar employment decision." Burns v. Gadsden State Community College, 908 F.2d 1512, 1518 n.9 (11th Cir. 1990).

"A 'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) "suspicious timing, ambiguous statements ..., and other bits and pieces from which an inference of discriminatory intent might be drawn," (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." Lewis v. City of Union City, Georgia, 934 F.3d 1169, 1185 (11th Cir. 2019). "Defendants of even minimal sophistication will neither admit discriminatory animus nor leave a paper trail demonstrating it." Riordan v. Kempiners, 831 F.2d 690, 698 (7th Cir. 1987). "A plaintiff is entitled to rely on circumstantial evidence to convince the trier of fact that an employer's explanation for his discharge is pretextual and that his discharge was more likely than not motivated by discriminatory intent."  See Zaklama v. Mt. Sinai Medical Center, 842 F.2d 291, 296 (11th Cir. 1988). "To require otherwise would impose on the

plaintiff the encumbrance of producing direct evidence of discrimination within an evidentiary framework specifically designed for situations in which no such evidence is available." Munoz v. Oceanside Resorts, Inc., 223 F.3d 1340, 1346 (11th Cir. 2000). Once the decision-maker's credibility is damaged, a jury can conclude that defendant acted for discriminatory reasons.

The evidence in this case would permit any reasonable jury to find Defendant liable for a sexually hostile work environment and retaliation. Plaintiff's non-renewal for 2018-2019 was a *fait accompli* even before Plaintiff's medical leave in October 2017. It was set in stone in December 2017 as Rose testified. Shelley's interactions with Plaintiff after December 2017 were all in an effort to create a paper trail that apparently did not exist when Cantees demanded preparation of the same. Shelley is a 29-year employee and Cantees felt the need to speak with Shelley to ensure that Plaintiff was being "documented." Obviously, Cantees was marching to the beat commanded by Bowden either directly or speaking through Kingsley. The unlawful ending to Plaintiff's career as an administrator is due to the fact that Shelley, Cantees and Kingsley all sold out and sacrificed Plaintiff's career and health to stay in Bowden's good stead.

WHEREFORE, Defendant's MSJ should be denied.

BERMAN LAW FIRM, P.A.

By:   */s/ Craig L. Berman*
       Craig L. Berman, Esquire
       BERMAN LAW FIRM, P.A.
       Fla. Bar No. 068977
       111 Second Ave. N.E.; Suite 706
       St. Petersburg, FL 33701
       Phone: (727) 550-8989
       Fax: (727) 894-6251
       craig@bermanlawpa.com

**CO-COUNSEL FOR PLAINTIFF**

-20-

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on this <u>18th</u> day of November, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send Notice to all Counsel of record.

/s/ Craig L. Berman
Attorney
