LYNA JIMENEZ-RUIZ,

      Plaintiff,

v.                             Case No. 8:18-CV-01768-T-02-AEP

SCHOOL BOARD OF
SARASOTA COUNTY,

      Defendant.

_____/

## ORDER

      This matter comes to the Court on a Motion for Summary Judgment filed by the Defendant, School Board of Sarasota County, Dkt. 35. Plaintiff, Lyna Jimenez-Ruiz, filed a memorandum in opposition, Dkt. 63, to which Defendant replied, Dkt. 66. With the benefit of able briefing, the Court grants in part and denies in part the Defendant's Motion for Summary Judgment, Dkt. 35.

## BACKGROUND

      This case centers on the employment relationship between Lyna Jimenez-Ruiz ("Ruiz") and the School Board of Sarasota County ("SBSC"). Ruiz alleges that over the course of four years of employment with SBSC she was harassed sexually, harassed regarding her race and national origin, retaliated against for reporting this harassment, and retaliated against for taking Family Medical Leave

Act ("FMLA") leave for stress caused by her employment. SBSC contends these allegations are false.

In summer 2014, Ruiz was hired by Dr. Todd Bowden ("Bowden") as Assistant Executive Director at Suncoast Technical College. Dkt. 59-2 at 9. During Ruiz's time at Suncoast, Bowden was her direct supervisor. *Id.* Also during this time Ruiz alleges that Bowden subjected her to "continuous inappropriate comments and accusations." Dkt. 45 at 4 ¶ 3. In sum, Ruiz alleges that Bowden sexually harassed her, she refused his advances, and Bowden retaliated against her for this refusal. Dkt. 45 at 4–5 ¶ 3–8. In late 2015 Ruiz began to discuss this alleged harassment with coworkers. Dkt. 59-2 at 15.

In February 2016, Bowden confronted Ruiz about the allegations she was making about him. Dkt. 59 at 42:2–18. Bowden told Ruiz that she should file an internal complaint with SBSC if she felt that she was being harassed but implied that it would be ill-received. *Id.* Ruiz alleges that at this point Bowden began to retaliate against her for refusing his advances and for making allegations against him. Dkt. 59 at 50–52.

In late-spring 2016, Bowden approached Ruiz about being transferred to a different school within the district. Dkt. 59-12 at 6. Ruiz agreed and alleges that despite offers to assist with the transfer Bowden prevented her transfer to Pineview School, a preferred transfer school for Ruiz. Dkt. 59-3 at 32–33. Ruiz was instead

transferred to Booker High School into the position of Testing Coordinator with the title of Assistant Principal. *Id.* Ruiz viewed this as a demotion and as a punishment. Dkt. 45 at 7 ¶ 18. In her new position Ruiz's direct supervisor was Principal Rachel Shelley ("Shelley").

In September 2016, while in her new position at Booker, Ruiz told Shelley about the alleged harassment by Bowden. Dkt. 59 at 158. Shelley reported this to SBSC's Human Resources department. Dkt. 60 at 17–18. Around this same time SBSC was in the process of hiring a new superintendent and Bowden was a lead contender for the position. Dkt. 55 at 10:2–20. In order to determine the veracity of the allegations surrounding Bowden SBSC retained an outside investigator. *Id.* The investigator determined these allegations to be unfounded. Dkt. 59-3 at 37.

Subsequently, Bowden was selected as superintendent in October 2016 and took office in March of the next year. Dkt. 60 at 127. At this point Ruiz alleges that her relationship with Shelley at Booker changed.[1] Ruiz alleges that this change in her relationship with Shelley stemmed from her being placed on Bowden's "hit

---

[1] There is some dispute over when Ruiz alleges her relationship with Shelley changed: when Bowden was selected as superintendent or when he took office. *Compare* Dkt. 59 at 54–55 *with* Dkt. 62 ¶ 13. For the purposes of this Order the Court will disregard the later inconsistent allegation and assume that Ruiz alleges her relationship with Shelley changed after Bowden took office as superintendent in March 2017. *See Brown v. Gulf Coast Jewish Family Servs., Inc.*, No. 810-CV-1749-T-27AEP, 2011 WL 3957771, at *3 (M.D. Fla. Aug. 9, 2011), report and recommendation adopted, No. 8:10-CV-1749-T-27AEP, 2011 WL 4005928 (M.D. Fla. Sept. 8, 2011) (holding a court may disregard portions of affidavits that are inconsistent with previous testimony).

list." Dkt. 45 at 10 ¶ 36. Ruiz alleges that after Bowden became superintendent there was pressure from Bowden down to Shelley for Ruiz's employment contract to not be renewed. *Id.*

Ruiz alleges that, as a part of this pressure campaign by Bowden, Shelley began to harass and demean Ruiz. Dkt. 45 at 11–12. Among other things, Ruiz alleges that Shelley made derogatory remarks about her national origin and assigned her inordinately difficult tasks. Dkt. 59 at 68–69, 137–42. And, despite the positive opinions of other staff, Shelley criticized Ruiz's performance as Testing Coordinator. Dkt. 57 at 39–40.

In October of 2017, Ruiz was diagnosed with post-traumatic stress disorder, major depressive disorder, and generalized anxiety disorder as a result of the alleged harassment by Bowden and Shelley. Dkt. 50. Pursuant to doctor's orders Ruiz took medical leave. *Id.* A few weeks later Ruiz requested and was approved for twelve weeks of FMLA leave. Dkt. 59 at 96.

In November, and while on FMLA leave, Ruiz submitted an internal equity complaint alleging that Shelley retaliated against her by reassigning her job duties, giving her a negative performance review, being hostile and disrespectful, providing negative criticism of her work performance, denying her career opportunities, and inequality of night duties. Dkt. 61-13. In December, SBSC hired an outside investigator to explore these allegations. Dkt. 59-12 & 59-13. The

investigator determined that these allegations were unfounded. *Id.* On December 19, 2017, Ruiz filed a Charge of Discrimination with the EEOC alleging sexual harassment and retaliation by Bowden and retaliatory harassment by Shelley. Dkt. 59-7.

On January 22, 2018, Ruiz returned to work on a part-time basis. Dkt. 61 at 245:8–11. On March 5, 2018, Shelley and Ruiz met to discuss Ruiz's mid-year review. *Id.* at 271:3–14. Shelley based her evaluation on the periods from July 1, 2017 to October 27, 2017 and January 29, 2018 to March 5, 2018. Dkt. 61 at 295–96. Shelley completed this evaluation on a paper copy and determined that the evaluation resulted in a "Needs Improvement" rating. Dkt. 61-16. Ruiz alleges that when properly calculated the evaluation resulted in a "Effective" rating. Dkt. 45 at 18 ¶ 73. Additionally, the paper copy of the evaluation appears to have been changed to reflect some evaluation ratings that were "Effective" being lowered to "Needs Improvement." Dkt. 61-16. Up until this point Shelley had given Ruiz an "Effective" performance review in June 2017, sent her a memorandum of instruction in May 2017 regarding Shelley's concerns with Ruiz's performance, and sent her a letter in November 2017 regarding Shelley's concerns with Ruiz's performance. Dkt. 60 at 117:3–20; Dkt. 60-6; Dkt. 61 at 214.

Ruiz contested this evaluation and was given the opportunity by Shelley to meet again and present evidence regarding areas rated "Needs Improvement" over

the course of two meetings—one meeting in April and one in May. Dkt. 61 at 277:6–17. When Shelley and Ruiz met on April 9, 2018, Shelley increased two of the ratings but refused to alter the others. Dkt. 59 at 121:9–16. At this meeting Shelley told Ruiz that the May meeting would be cancelled, and Ruiz would not get the opportunity to contest the remaining disputed ratings. *Id.* at 120–21:25–8. Ruiz also alleges that at this meeting Shelley advised Ruiz that her contract would not be renewed. Shelley alleges that she made this decision on April 10, 2018. Dkt. 37 ¶ 17.

On April 30, 2018, after being informed that her contract would not be renewed, Ruiz filed a Charge of Discrimination with the EEOC alleging, for the first time, that Shelley was treating her unfairly due to her race and national origin. Dkt. 59-8. On July 20, 2018, Ruiz filed another charge of discrimination with the EEOC alleging that Bowden prevented her from obtaining another position in the district after her contract lapsed. Dkt. 59-20. On November 16, 2018, Ruiz filed her final Charge of Discrimination with the EEOC alleging sexual harassment, retaliation for rejecting and complaining about the sexual harassment, and for race and national original discrimination. Dkt. 59-21. Ruiz filed this suit in state court on July 13, 2018 and SBSC removed it to this Court on July 19, 2018. Dkt. 1.

## LEGAL STANDARD

Under Rule 56, Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996). An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.*

The moving party bears the initial burden of identifying those portions of the record demonstrating the lack of a genuinely disputed issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If met, the burden shifts to the non-moving party to "come forward with specific facts showing that there is a genuine issue for trial." *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018) (citation omitted). To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must go beyond the pleadings and "identify affirmative evidence" that creates a genuine dispute of material fact. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998).

In determining whether a genuine dispute of material fact exists, the Court must view the evidence and draw all factual inferences therefrom in a light most favorable to the non-moving party and must resolve any reasonable doubts in the non-moving party's favor. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita*, 475 U.S. at 587.

## DISCUSSION

Ruiz's Second Amended Complaint focuses on three types of discrimination or retaliation she alleges against SBSC—for reasons based on sex, race or national origin, and the exercise of FMLA rights. Ruiz alleges that while employed by SBSC she suffered discrimination due to her sex (Counts I and II) and her race or national origin (Counts V, VI, VII, VIII). She alleges that because of her objections to this alleged discrimination SBSC retaliated against her (Counts III, IV, IX, X). She also alleges that SBSC interfered with her right to take FMLA leave (Count X) and then retaliated against her for taking that leave (Count XI). SBSC moves for summary judgment on each of these claims. And, as an overall concern, SBSC argues that Ruiz's Second Amended Complaint contains allegations that are outside of the appropriate timeframe for Title VII and FCRA claims and must be disregarded. This Court will address each of these arguments in turn.

1. Title VII and Florida Civil Rights Act

First the Court must address SBSC's argument that aspects of several of Ruiz's claims are time barred under Title VII and the FCRA. SBSC argues that as a part of Counts I, II, III, and IV of the Second Amended Complaint Ruiz alleges discrete incidences of harassment or retaliation outside the statutory timeframe for Title VII and Florida Civil Rights Act consideration. Dkt. 35 at 24. Ruiz counters that these are not discrete actions but portions of the creation of a hostile work environment that extends into the applicable statutory timeframe. Dkt. 63 at 8–11. This Court agrees.

Title VII and the FCRA each require a plaintiff to file a charge of discrimination with the EEOC before suing in district court. *See Abram v. Fulton County Government*, 598 F. App'x 672, 674 (11th Cir. 2015). Title VII requires that a plaintiff file charges with the EEOC "within three-hundred days after the alleged unlawful employment practice occurred . . . ." 42 U.S.C. § 2000e-5(e)(1). Claims under the FCRA are subject to a 365-day statute of limitations. Fla. Stat. § 760.11(1) (2019). "A claim is time barred if not filed within these time limits." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002).

Ruiz filed her first charge of discrimination on December 20, 2017. Dkt. 59-7. Thus, all acts of alleged discrimination and retaliation before February 24, 2017 are time-barred under Title VII and all alleged acts of discrimination and

retaliation before December 20, 2016 are time-barred under the FCRA.

Yet Ruiz argues that her claims for harassment are not based on discrete acts but instead the cumulative effect of these acts creating a hostile work environment. As the noted by the United States Supreme Court, "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *Morgan*, 536 U.S. at 105.[2] This is because "[s]uch claims are based on the cumulative effect of individual acts." *Id*. at 115. "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117.

Ruiz's argument about the alleged harassment she suffered at the hands of Bowden is premised upon the idea that Bowden—her boss—made inappropriate sexual advances at her, she refused those advances, and he used his power as her boss to punish that refusal. It follows that when Ruiz left Suncoast Technical College the harassment stopped because Bowden no longer had the power to harass her for refusing his advances. According to SBSC, even if Bowden were

---

[2] Because the FCRA is patterned after Title VII, courts routinely apply Title VII case law to discrimination claims brought under the FCRA. *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998).

harassing Ruiz, at this point in May 2016 the harassment stopped and is around six-months outside the applicable timeframe.

Yet it is disputed whether the harassment permanently discontinued. Ruiz puts forth evidence that when he became superintendent Bowden put Ruiz on his "hit list" and instructed Shelley to create pretext in order to fire Ruiz. Dkt. 45 at 10 ¶ 36. These actions happened within the statutory time period. And, despite the gap between Ruiz's allegations against Bowden in 2016 and her allegations against him in 2017, Ruiz alleges ongoing harassment. The gap is a result of Bowden losing the power to allegedly harass Ruiz. When Bowden begins as superintendent of SBSC, this is the first time that Bowden is again able to harass Ruiz—albeit in a less direct way. Dkt. 60 at 127. For these reasons, Ruiz presents sufficient evidence within the statutory timeframe to create a genuine issue of material fact as to whether she was subjected to a hostile work environment.

And while SBSC contends that "the majority of the alleged acts enumerated by Ruiz . . . have nothing to do with gender other than the fact that they involve Ruiz, who is female," all of the actions, when viewed together, relate to harassment based on Ruiz's sex. Dkt. 66 at 1–2; *see Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1242 (11th Cir. 1999) ("In sexual harassment cases, the courts must consider the alleged conduct in context and cumulatively."). The story that Ruiz paints is a progression from sexual advances, followed by her refusals, and ultimately, to

retaliation by Bowden as her immediate superior and then as superintendent. Dkt. 45 at 4–5 ¶¶ 3–8. In the light most favorable to Ruiz, this is enough to allege ongoing sexual harassment by Bowden. *See, e.g.*, *Sadeghian v. Univ. of S. Ala.*, No. CV 18-00009-JB-B, 2018 WL 7106981, at *11 (S.D. Ala. Dec. 4, 2018), report and recommendation adopted, No. CV 18-00009-JB-B, 2019 WL 289818 (S.D. Ala. Jan. 22, 2019) (finding sexual harassment when the defendant "subjected [the plaintiff] to unwanted sexual advances and retaliated against him when he refused those advances"). That said, whether these acts are indeed connected is a disputed material fact not appropriate for summary judgment.

In sum, Ruiz, rather than alleging harassment through discrete actions, argues that SBSC subjected her to a hostile work environment. In the light most favorable to the nonmovant, at least one harassing act occurred within the statutory timeframe—bringing the entire hostile work environment claim within the statutory timeframe. So, summary judgment is denied as to this issue.

2. Race and National Origin Discrimination

In the Second Amended Complaint Ruiz alleges discrimination by SBSC because of her race and national origin in violation of Title VII and the FCRA. SBSC moves for summary judgment on these claims, arguing that Ruiz fails to prove the prima facie case for a hostile work environment claim and is unable to rebut SBSC's nondiscriminatory reason for not renewing her contract. Dkt. 35 at 4.

Ruiz counters that the conduct by Shelley was severe and pervasive enough to constitute a hostile work environment. Dkt. 63 at 11. This Court disagrees.

"A hostile work environment claim . . . is established upon proof that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)). To support a hostile work environment claim, Ruiz must show that:

> (1) [s]he belongs to a protected group; (2)[s]he was subjected to unwelcome harassment; (3) the harassment was based on [her] membership in the protected group; (4) it was severe or pervasive enough to alter the terms and conditions of employment and create a hostile or abusive working environment; and (5) the employer is responsible for that environment under a theory of either vicarious or direct liability.

*Edwards v. Prime, Inc.*, 602 F.3d 1276, 1300 (11th Cir. 2010).

Establishing that harassing conduct was severe or pervasive enough to alter an employee's terms or conditions of employment includes both a subjective and objective component. *Harris*, 510 U.S. at 21–22. The employee must subjectively perceive the harassment as severe and pervasive enough to alter the terms or conditions of employment. *Id.* And the environment must be one that "a reasonable person would find hostile or abusive[.]" *Id.* at 21.

While the objective element is "not subject to mathematical precision," courts can infer an environment is "hostile" or "abusive" from the circumstantial facts. *Edmond v. Univ. of Miami*, 441 F. App'x 721, 725 (11th Cir. 2011). The factors a court considers in evaluating the objective component include: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Njie v. Regions Bank*, 198 F. App'x 878, 883 (11th Cir. 2006).

In her deposition Ruiz describes the following instances of national origin or race discrimination:

1. Kathy Pritz, a colleague of Ruiz's, told Ruiz that she felt that Shelley treated Ruiz—and other Hispanic staff, students, or parents—different because of race and national origin (Dkt. 59 at 62–64);
2. Darby Larkin, a colleague of Ruiz's, told her that Shelley made a joke about Ruiz being Hispanic (*Id.* at 63:19–25);
3. Once, in a meeting with other senior staff, Shelley asked Ruiz "are you speaking English?" (*Id.* at 69:1–6);
4. Once, also during a meeting with other senior staff, Shelley said that Ruiz "does not know how to speak English" (*Id.* at 69:7–15); and
5. Once, privately, Shelley asked Ruiz if her doctorate degree was in Spanish instead of English (*Id.* at 69:17–18).

Each of these instances occurred between Ruiz being transferred to Booker High School in August 2016 and Ruiz filing the April 2018 Charge of Discrimination with the EEOC. Even in the light most favorable to Ruiz, these actions are not

sufficiently severe or pervasive enough to sustain a hostile work environment claim.

While there is no mathematical precision to determining what is pervasive, it requires more than several occasions of verbal conduct to create a hostile work environment. *Compare Njie*, 198 F. App'x. at 880 (finding several occurrences of racial slurs over the course of eight months infrequent enough to constitute a hostile work environment) *with Miller*, 277 F.3d at 1276 (11th Cir. 2002) (finding that "hurl[ing] ethnic slurs at [Plaintiff] three to four times a day" is frequent enough to constitute a hostile work environment). Here, Ruiz alleges that Shelley made three derogatory remarks in Ruiz's presence. Ruiz also alleges that, twice, coworkers told her about offensive racially based conduct by Shelley. One instance was a vague reference to a racially based joke allegedly made by Shelley. The other was a comment regarding the coworker's perception that Shelley treated Hispanic people different. *Cf. Hall v. Dekalb Cty. Gov't*, 503 F. App'x 781, 791 (11th Cir. 2013) (finding general allegations of racist behavior insufficient to survive a summary judgment where plaintiffs provided no specific examples of harassment to support their claim). In all, Ruiz alleges four separate offensive verbal statements by Shelley and a general comment by a coworker about Shelley's attitude toward Hispanic people, all in the course of a year of employment. This limited frequency cuts against Ruiz.

Beyond that, Title VII and FCRA are not general civility codes. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Courts in this Circuit have repeatedly declined to extend the protections afforded by these provisions to conduct that is merely offensive or mocking. *Edmond*, 441 F. App'x at 725 (11th Cir. 2011) (finding that mocking the plaintiff's Haitian accent and "calling [a coworker] to interpret for [him] in the presence of others" was not severe enough); *Dugandzic v. Nike, Inc.*, No. 617CV848ORL40KRS, 2018 WL 4924343, at *5–6 (M.D. Fla. Oct. 10, 2018) (finding mocking plaintiff mocked for his "Croatian linguistics" not severe enough); *Salazar v. Delta Health Grp., Inc.*, No. 10-20783-CIV, 2010 WL 5313497, at *10 (S.D. Fla. Dec. 20, 2010) (finding mocking plaintiff for her "very strong accent" and for being a "crazy Cuban" not severe enough). Instead, Title VII and FCRA only protect against conduct that is sufficiently severe enough "to alter the conditions of the victim's employment and create an abusive working environment[.]" *Miller*, 277 F.3d at 1275.

Even taking Kathy Pritz's and Darby Larkin's vague allegations into account, Ruiz fails to show severe enough conduct by Shelley. Ruiz does not allege that Shelley used racial slurs or engaged in offensive physical conduct against her. Instead, Ruiz alleges that Shelley made three comments to Ruiz about her ability to speak English. The two secondhand accounts by Ruiz's coworkers are also insufficiently severe. Ms. Pritz's comment is based on her general perception of

Shelley rather than a specific act toward Ruiz.[3] And Mr. Larkin's comment is similar in severity to the comments Ruiz heard herself. While boorish, these comments are not so severe enough to constitute a hostile work environment.

Giving every reasonable inference in favor of Ruiz, Shelley's references to Ruiz's accent or nationality may have been humiliating to Ruiz and may have even interfered with her work. Yet, even in this light, Ruiz fails to show sufficient evidence to support a reasonable finding that she suffered from enough severe or pervasive discriminatory harassment to "alter the terms of employment" or "create an abusive environment." *See Miller*, 277 F.3d at 1275. For this reason, the Court finds Defendant is entitled to summary judgment on Ruiz's race- and national origin-based hostile work environment claims, Counts V, VI, VII, and VIII.

3. <u>FLMA Interference</u>

SBSC asserts that Ruiz cannot establish a case for interference under the FMLA. Dkt. 35 at 8. To recover on a FMLA interference claim, a plaintiff must demonstrate "that she was denied a benefit to which she was entitled," *Pereda v. Brookdale Senior Living Comms.*, 666 F.3d 1269, 1274 (11th Cir. 2012) (quoting *Harley v. Health Ctr.*, 487 F. Supp. 2d 1344, 1357 (S.D. Fla. 2006)), and that she

---

[3] In an affidavit Ms. Pritz states that she "believe[s] Dr. Shelley's harsh, disrespectful treatment of Dr. Jimenez-Ruiz was due to her being Hispanic." Dkt. 49 ¶ 10. Beyond this conclusory allegation, Ms. Pritz describes three occasions in which she observed actions by Shelley that she felt were discriminatory to Hispanic people. *Id.* ¶¶ 3–5. Ms. Pritz does not connect these occasions with any specific allegations about Shelley's treatment of Ruiz.

has been prejudiced by the violation in some way. *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002).

"The FMLA grants an eligible employee the right to take up to 12 workweeks of unpaid leave annually for any one or more of several reasons, including '[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1293 (11th Cir. 2006) (quoting 29 U.S.C. § 2612(a)(1)(D)). Beyond that, the FMLA grants an eligible employee who takes leave under the FMLA the right, upon returning from that leave, "to be restored by the employer to the position of employment held by the employee when the leave commenced" or to an equivalent position. 29 U.S.C. § 2614(a)(1). The FMLA also makes it unlawful "for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the FMLA]." 29 U.S.C. § 2615(a)(1).

Yet, this issue is not ripe for summary judgment. Ruiz requested and received leave under FMLA. Dkt. 38 at 96:17–20 & 81:10–12. That said, Ruiz is not arguing that she was denied the benefit of taking FMLA leave but instead that when she returned from leave, she was punished for taking that leave. Dkt. 63 at 16–17.

Ruiz argues that upon returning from leave her duties were curtailed by Shelley. Further, Ruiz argues that when it came time for her evaluation and the resulting decision not to renew her contract, Shelley was influenced by Ruiz's decision to exercise her FMLA rights. *See, e.g.*, Dkt. 42 at 253 & 298:2–11; Dkt. 45 at 17–19. Ruiz alleges that her job performance was judged by Shelley without adjusting for her protected FMLA leave—leading to the decision not to renew Ruiz's contract. *See* 29 C.F.R. § 825.220(c) ("By the same token, employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions[.]").

SBSC argues that because Ruiz's performance evaluation and the subsequent decision not to renew her contract were not influenced by Ruiz's exercise of her FMLA rights, SBSC did not interfere in Ruiz's enjoyment of her FMLA rights. SBSC points to Shelley's assertions that she judged Ruiz's job performance solely on her post-FMLA leave performance without taking the leave into consideration. Dkt. 42 at 296:18–24. Since this Count centers on a dispute of material fact it must be decided by a factfinder. Thus, summary judgment must be denied on this Count.

### 4. Retaliation Counts

Ruiz sets out theories of retaliation based on Title VII (Counts III and IX), the FCRA (Counts IV and X), and the FMLA (Counts XII). When a plaintiff is

only able to establish retaliation using circumstantial evidence, the Court must analyze the claims under the burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of retaliation. *Id.* at 802. To establish a prima facie case of retaliation under these provisions, Ruiz must show that she (1) engaged in statutorily protected activity; (2) suffered an adverse employment action; and (3) the adverse action was causally related to the protected activity. *Gray v. City of Jacksonville, Fla.*, 492 F. App'x 1, 8 (11th Cir. 2012); *Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 798 (11th Cir. 2000).

"An adverse employment action includes employer conduct 'which has a materially adverse effect on the plaintiff, irrespective of whether it is employment or workplace-related.'" *Watson v. Ala. Farmers Coop., Inc.*, 323 F. App'x. 726, 729 (11th Cir. 2009) (quoting *Crawford v. Carroll*, 529 F.3d 961, 973 (11th Cir. 2008)). A "materially adverse" action is one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Crawford*, 529 F.3d at 974 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). But "not all conduct by an employer negatively affecting an employee constitutes adverse employment action." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1238–39 (11th Cir. 2001) (internal quotations and citations omitted).

Title VII—and the similarly interpreted FCRA—prohibits retaliation against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing [thereunder]." 42 U.S.C. § 2000e–3(a). In *University of Texas Southwestern Medical Center v. Nassar*, the Supreme Court held that a plaintiff bringing a Title VII retaliation claim "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." 570 U.S. 338, 362 (2013). [4] A plaintiff can satisfy this element by providing evidence of the employer's knowledge of the protected expression along with a close temporal proximity between this awareness and the adverse employment action. *Adams v. City of Montgomery*, 569 F. App'x 769, 773 (11th Cir. 2014). But "close temporal proximity between two events, standing alone, is not a panacea, absent any other evidence that the employment decision was causally related to the protected

---

[4] SBSC asserts that the "but-for" standard required for Title VII claims under *Nassar* also applies to FMLA claims. In *Nassar*, the Court determined that the "but-for" causation test set out for ADEA discrimination claims in *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009), applied equally to Title VII retaliation claims. 570 U.S. 338, 362 (2013). Title VII forbids retaliation "because [an employee] has opposed" an unfair practice or made a charge under the statute which the Court reasoned to mean that the employee's action must be the but-for cause of the employer's discrimination. *Id.* at 352.

It is unclear if this reasoning applies in the context of FMLA and there is a dearth of binding precedent here. In any event, the Eleventh Circuit has interpreted the FMLA to prohibit employers from discriminating against an employee "because [she] engaged in activity protected by the Act." *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001). Thus, it seems that the *Nassar* but-for test also applies in the context of FMLA.

activity." *Hankins v. AirTran Airways, Inc.*, 237 F. App'x. 513, 520 (11th Cir. 2007).[5]

"Once a plaintiff has established a prima facie case, the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). If that burden is met, the plaintiff must then prove the reason is a pretext for retaliatory conduct. *Id.* "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004) (internal citation omitted).

SBSC moves for summary judgment on each of Ruiz's retaliation counts based on Ruiz's failure to prove her prima facie case and the existence of legitimate, nonpretextual reasons for the alleged actions by SBSC. Dkt. 35 at 8–19. The Court will address each theory of retaliation in turn.

    a.  <u>Title VII and FCRA Retaliation</u>

SBSC moves for summary judgment on Ruiz's Title VII (Counts III and IX)

---

[5] *Nassar* requires a plaintiff in a retaliation case to prove but-for causation. Yet neither the Supreme Court nor the Eleventh Circuit has clarified the stage at which the "but-for" standard applies. *Compare Smith v. City of Fort Pierce, Fla.*, 565 F. App'x 774, 778 (11th Cir. 2014) (applying *Nassar* at prima facie stage), *with Mealing v. Ga. Dep't. of Juvenile Justice*, 564 F. App'x 421, 427 (11th Cir. 2014) (applying *Nassar* at the pretext stage). That said, courts in this district have generally applied the but-for standard at the prima facie case stage. *See Collogan v. G4S Secure Sols. (USA) Inc.*, No. 8:16-CV-556-T-17AEP, 2017 WL 10276704, at *15 (M.D. Fla. Aug. 11, 2017) (reviewing the different standards).

and FCRA retaliation claims (Counts IV and X).[6] Ruiz argues that SBSC retaliated against her based on her objections to the alleged sexual advances by Bowden and based on her objections to race- and national origin-based discrimination by Shelley.

To begin, Ruiz's national origin and race retaliation claims, Counts IX and X, fail as matters of law. Ruiz's first complaint about race and national origin discrimination was in July 2018 when she filed an EEOC charge. Dkt. 59-20. Yet Ruiz received her negative mid-year performance review from Shelley in early March of that year and Shelley decided to not renew Ruiz's contract in mid-April. Dkts. 61 at 265:3–8; 37 ¶ 17. Each of these alleged retaliatory actions occurred months before Ruiz first complained of race or national origin discrimination. Ruiz could not have been retaliated against based on her objection to perceived race or national origin discrimination because she had not yet objected when SBSC allegedly retaliated against her. *See McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008) (noting that causation requires that the decision maker at least be aware of the protected activity). Therefore, summary judgment is due for SBSC for Counts IX and X.

As to Ruiz's retaliation claims based on her objections to alleged sexual harassment by Bowden (Counts III and IV), Ruiz has established a prima facie

---

[6] These claims are analyzed identically. *See supra* note 2.

case for retaliation. First, Ruiz has presented evidence of materially adverse employment decisions: she received an unsatisfactory performance review and was terminated. *See Galloway v. GA Tech. Auth.*, 182 F. App'x 877, 881–82 (11th Cir. 2006); *Crawford v. Carroll*, 529 F.3d 961, 974 (11th Cir. 2008).

Second, Ruiz argues that these adverse employment decisions are causally connected to her objections to alleged sexual advances by Bowden. SBSC argues that Ruiz cannot prove but-for causation because of the large gap in time between her complaints and the adverse employment decisions. That said, "[w]here there [is] a significant time gap between the protected activity and the adverse action, the plaintiff must offer additional evidence to demonstrate a causal connection, such as a pattern of antagonism or that the adverse action was the first opportunity for the employer to retaliate." *Ward v. United Parcel Serv.*, 580 F. App'x 735, 739 (11th Cir. 2014).

Here, Bowden was chosen as superintendent in October 2016 and began that position on March 1, 2017. Dkt. 60 at 127. Before this Bowden had no ability to retaliate against Ruiz while she was at Booker High School. However, after becoming superintendent, Bowden presumably had the power to retaliate against Ruiz.

And while five months passed between Ruiz's 2017 EEOC charge and the eventual nonrenewal of her contract, the opportunity to retaliate against Ruiz as

superintendent was more indirect than if Bowden had been Ruiz's direct supervisor. Ruiz argues that the only opportunity Bowden had to retaliate against Ruiz is through influence exerted indirectly during the employment performance evaluation process and the contract renewal process—placing the opportunity to retaliate against her on a longer timeline. This time period is further extended due to Ruiz being on FMLA leave for a portion of those five months. It was not until she returned from leave that she received the negative performance review by Shelley.

Ruiz has also produced evidence that some calculations on her performance review were entered into the computer program in a way that produced a "Needs Improvement" rating rather than a "Effective" rating. Dkt 45 at 18. She also alleges that her her coworkers perceived her work product as good. Dkt. 57 at 39–40. Finally, she alleges that her nonrenewal was unprecedented in the contract renewal process for administrators in the school district. Dkt. 59 at 189:7–20. All of these taken together are enough that a reasonable factfinder could find a but-for connection between Ruiz's objections to the alleged sexual advances by Bowden and the decision by SBSC to ultimately not renew her contract.

But SBSC has submitted facially non-retaliatory reasons for having taken the actions against Ruiz. For instance, SBSC argues it identified legitimate concerns with the Ruiz's performance that caused her to receive a "Needs

Improvement" performance review. Dkt. 35 at 17. SBSC even points to a memorandum of instruction—months before her 2017 EEOC charge—that lays out some of the concerns repeated in her final performance review. Dkt. 60-6. As a result, Ruiz must now show that SBSC's proffered reasons are merely pretext for retaliatory employment actions.

Ruiz's primary argument about pretext involves her final performance evaluation. The paper copy of Ruiz's final performance review shows handwritten changes on some evaluation areas from "Effective" to "Needs Improvement" that Ruiz was unaware of until after the nonrenewal decision. Dkt. 61-16. Ruiz frames these changes as evidence of Shelley creating pretext to not renew Ruiz's contract. Ruiz argues that the original and unedited paper copy of her evaluation resulted in a "Effective" evaluation but then Shelley changed it to ensure Ruiz was rated "Needs Improvement." Dkt. 45 at 18. Shelley contends that this is just a normal part of the performance evaluation process. Dkt. 61 at 283–84. Whether these changes to Ruiz's performance evaluation are pretextual is plainly a disputed issue of material fact.

As evidence that the changes were part of the normal ongoing process of review, SBSC point to the fact that Ruiz was provided an opportunity to contest areas of her performance review. But Ruiz rebuts that although she was given two separate deadlines—April for some of the disputed areas and May for the others—

to respond to the disputed evaluations, after the April meeting Shelley informed her that she had decided to not renew Ruiz's contract. This meant that Ruiz would not be given the opportunity to argue errors in the evaluation of the three areas given "Needs Improvement" ratings that had originally been scheduled for the May meeting. Dkt. 45 at 19. Nor did Shelley allow Ruiz the opportunity to dispute any of the scores that Shelley had apparently changed by hand between the original final-performance review and the April disputed-scores meeting—despite allowing Ruiz to dispute other areas rated "Needs Improvement." Further, even for the areas where Shelley allowed Ruiz to present objections, there is a disputed issue of material fact as to whether the meeting in April to discuss the "Needs Improvement" evaluations was pretextual.

Taken as a whole, Ruiz has presented enough evidence that a reasonable factfinder could determine SBSC's stated reasons for not renewing Ruiz's employment contract were pretextual. For these reasons, Ruiz's Title VII and FCRA retaliation claims has disputed issues of material fact and disposition of these Counts (Counts III and IV) is not appropriate for summary judgment.

b. FMLA Retaliation

Next, SBSC moves for summary judgment on Ruiz's FMLA retaliation claim (Count XII). The parties agree that Ruiz engaged in statutorily protected activity by taking FMLA leave but disagree over her alleged adverse employment

decisions and, if indeed they were adverse employment decisions, whether they were causally connected to her FMLA leave.

Yet the facts associated with this claim are essentially the same as her sexual harassment Title VII retaliation claims. Ruiz claims that because she took FMLA leave she was retaliated against by receiving a negative performance review and later not having her contract renewed. As above, both actions by SBSC are adverse employment actions. *See Galloway*, 182 F. App'x at 881; *Crawford*, 529 F.3d at 974. And Ruiz alleges that but-for causation is established by many of the same events explained above, paired with the compact timeline between her return from leave and her final performance review.

In fact, the negative performance review and contract nonrenewal happened closer to her FMLA leave than her complaints about the alleged sexual harassment. Ruiz returned to work on a part-time basis on at the end of January 2018. Dkt. 61 at 245:8–11. In early March of that year, Shelley gave Ruiz a negative mid-year performance review and agreed to meet again within a month to discuss this review. Dkt. 61-17. Ruiz then returned to her position full-time in mid-March. Dkt. 61 at 296:10–17. In early April, Shelley completed the negative mid-year performance review and decided not to renew Ruiz's contract. Dkt. 37 ¶¶ 16–17. So, the evidence presented by Ruiz for her prima facie case for FMLA retaliation is

as sufficient—if not more so—as Ruiz's sexual harassment Title VII retaliation claim.

Yet, again like Ruiz's sexual harassment Title VII retaliation claim, SBSC presents evidence to justify Ruiz's nonrenewal in a nonretaliatory way. To which Ruiz presents the same evidence as above that these justifications are pretextual. As such, Ruiz's FMLA retaliation claim has disputed issues of material fact and disposition of this Count is not appropriate for summary judgment.

5. Punitive Damages under Title VII and FCRA

Title VII and the FCRA provide for the possibility of punitive damages, but not in suits against governmental agencies or subdivisions. 42 U.S.C. § 1981a(b)(1) ("A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision) . . . ."); Fla. Stat. § 760.11(5) ("The court may also award . . . punitive damages . . . . Notwithstanding the above, the state and its agencies and subdivisions shall not be liable for punitive damages."). SBSC is a state agency. *Buck v. McLean*, 115 So. 2d 764, 765 (Fla. 1st DCA 1959) ("County boards of public instruction are agencies of the State[.]") For this reason, summary judgment must be granted for SBSC on this issue.

## CONCLUSION

For the reasons stated above this Court grants in part and denies in part Defendant's motion for summary judgment. Dkt. 35. The Clerk is directed to enter judgment in favor of Defendant as to Count V, Count VI, Count VII, Count VIII, Count IX, Count X, and any demand for punitive damages against Defendant. This Court finds that there are still issues of material fact that prevent summary judgment from being granted for the remainder of the Counts, so summary judgment will be denied as to these and they remain for trial.

**DONE AND ORDERED** at Tampa, Florida, on January 28, 2020.


*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**


**COPIES FURNISHED TO:**
Counsel of Record